JUDGE SANDRA CABRINA JENKINS
*380 Following a jury trial, the trial court rendered judgment in favor of FIE, LLC ("FIE") and Iberia Tigers, LLC (collectively, "plaintiffs"), and against New Jax Condominium Association, Inc. ("New Jax") and Lafayette Insurance Company (collectively, "defendants"), in solido , in the amount of $1,185,700.00 for the loss of use of plaintiffs' condominium unit. In the first of these consolidated appeals, defendants seek reversal of the trial court's judgment and the dismissal of plaintiffs' claims for loss of use damages. In an answer to defendants' first appeal, plaintiffs seek reversal and remand on the trial court's pre-trial judgment precluding plaintiffs from introducing evidence at trial to support a claim for bad faith damages against Lafayette.
During the pendency of the first appeal, plaintiffs filed a motion to tax costs of the trial against defendants, which the trial court granted in part, assessing court costs and expert fees in the amount of $49,862.92 against defendants. Defendants then filed an appeal of the trial court's judgment assessing costs of the trial. This Court ordered that the two appeals be consolidated.
Based on our review of the record and the applicable law, we affirm the trial court's March 24, 2016 judgment finding defendants jointly liable to plaintiffs for the loss of use damages awarded by the jury. We also affirm the trial court's March 2, 2016 pre-trial judgment challenged by plaintiffs in their answer to the first appeal. Finally, we affirm the trial court's January 6, 2017 judgment assessing costs and expert fees.
FACTUAL BACKGROUND
Robert Chris Jordan is the sole member and manager of FIE and Iberia Tigers, LLC ("Iberia Tigers"), through which Mr. Jordan acquires mostly commercial properties for investment purposes. In May 2007, FIE purchased Unit 5-C in the New Jax Brewery building, located at 640 Decatur Street, which is managed and operated by New Jax. FIE later transferred ownership of Unit 5-C ("the condo") to Iberia Tigers. According to Mr. Jordan, the condo was purchased as an investment property and for his personal use to entertain family, friends, or clients during visits to New Orleans.
Within the first year of acquiring the condo, Mr. Jordan observed water intrusion in areas of the condo directly below the roof of the building. Mr. Jordan reported the water intrusion to Earl Weber, Jr., the President of the Board of New Jax, and requested that repairs be made to the roof to stop the water intrusion.
In April 2008, finding that New Jax had not yet made successful attempts to repair the roof and stop the water leaks, Mr. *381 Jordan began withholding the monthly condo assessment fees owed by FIE to New Jax.
In July 2009, New Jax made attempts to discover the source of the water leaks by cutting holes in the ceiling and walls of the condo; during this process, New Jax tarped off the perimeter of the condo with Visqueen plastic sheeting. At that point, Mr. Jordan found the condo uninhabitable and unusable for its intended purpose. Between July 2009 and October 2011, Mr. Jordan corresponded with New Jax by email about ongoing water leaks, damage to furniture, and the presence of black mold growth in the condo;[1] along with each complaint, he constantly sought updates from New Jax on the status of the roof repairs. During that same two year period, New Jax reported several times to Mr. Jordan that attempts were being made to find the source of the water leaks, that roofers were making repairs to the roof, and that the condo was being monitored for further water leaks. However, by 2012, the roof had not been repaired successfully; and, on March 28, 2012, plaintiffs[2] instituted this suit for damages against New Jax.
In July 2012, plaintiffs hired Greg Fisher, a roofing contractor and consultant, to perform a visual inspection of the roof above the condo and prepare a report of his findings. During his initial inspection, Mr. Fisher observed that limited remedial repair work was being undertaken on the roof, and he recommended that water tests be performed to assess the effectiveness of that work. In October 2012, Mr. Fisher returned for a second visual inspection and he observed that a significant component of the roof-the standing seam metal roofing-had been completely removed and no temporary waterproofing material had been installed to protect the building from the weather. He returned a week later and observed that Visqueen had been installed to cover the portion of the roof that had been removed; however, he did not observe progress in the completion of the repairs. Mr. Fisher discussed his observations with Mike Storms, New Jax's maintenance manager overseeing the roof repairs, and he recommended that New Jax hire a "competent roofer" to perform all necessary roof repairs due to the complex nature of the building's roofing system. Subsequently, by letter dated November 21, 2012, plaintiffs formally requested that New Jax hire a competent roofer to repair the roof.
In December 2012, New Jax hired Paul Couget to install a new roof over the condo. In January 2013, Mr. Couget submitted an invoice to New Jax for the completed installation of a "standing seam snap lock roof system complete with all necessary trim, flashing, and closures." Despite these repairs, Mr. Jordan continued to find water leaks in the condo, and he reported to New Jax that the condo had sustained further water damage and mold growth during the months that the roof was removed. In April 2013, plaintiffs and New Jax came to an agreement that New Jax would gut the affected areas of the condo but no interior repairs would take place until the recurring leaks were repaired successfully.
*382 In April 2014, New Jax held an annual Board meeting at which all new Board members were elected. In July 2014, the newly elected Board of New Jax hired a new property management company and a roofing consulting firm, BE-CI, to assess the roof. On August 4, 2014, BE-CI issued a detailed report of its findings and recommendations for necessary repairs. In September 2014, New Jax hired Acadian Waterproofing to complete the repairs outlined in BE-CI's report.
In May 2015, a hard rain tested the roof repairs and provided confirmation that the roof and water leaks had been repaired successfully. Soon thereafter, repair work began on the interior of the condo. All repairs were complete by September 15, 2015-seventy-five months after Mr. Jordan had first reported that the condo was unusable.
PROCEDURAL BACKGROUND
Plaintiffs filed this suit for damages against New Jax on March 28, 2012. In the original petition, plaintiffs alleged that, since 2009, water leaking from the roof of the New Jax property had caused extensive damage to their condo, making it uninhabitable, as a direct result of New Jax's negligence in failing to maintain and repair the roof.[3] Plaintiffs sought damages for the loss of use of the condo, subsequent rental value, the cost of reconstruction, and the loss of personal enjoyment.
On March 11, 2013, plaintiffs filed their first supplemental and amended petition alleging further damages as a result of New Jax's "ineffective, negligent effort to repair the exterior roof,"[4] and naming New Jax's liability insurer, Lafayette Insurance Company ("Lafayette"), as a jointly liable defendant. Subsequently, in a third supplemental and amended petition, filed on March 27, 2014, plaintiffs asserted an additional claim against Lafayette for bad faith pursuant to La. R.S. 22:1892, and, after being granted leave to file a fourth supplemental and amended petition on July 7, 2015, plaintiffs added a claim for the recovery of attorney's fees pursuant to La. R.S. 9:1121.104.
After answering the petition, New Jax filed a reconventional demand against plaintiffs for failure to pay monthly condo assessment fees as required by New Jax's Declaration and By-Laws. New Jax asserted that plaintiffs had failed to pay their monthly condo assessment fee of $1,418.07 since April 2008. New Jax sought all amounts due, owing, and accruing through the period of proceedings, as well as an acceleration of fees for one year, pursuant to La. R.S. 9:1123.115(A)(1) of the Louisiana Condominium Act. In total, New Jax sought judgment against plaintiffs *383 for $96,424.74, together with legal interest, attorney's fees, and costs.
Prior to trial, which was continued from its original setting of September 15, 2014 to March 7, 2016, the parties engaged in protracted motion practice, which narrowed the claims and issues proceeding to trial. At the time of trial, the only claims remaining for adjudication were plaintiffs' claim for loss of use damages and defendants' reconventional demand for unpaid condo assessment fees.
Following a five-day jury trial, the jury returned the following findings and award on plaintiffs' main demand:
Do you find that New Jax breached its obligation owed to plaintiffs under the contract between the parties? Answer: Yes.
Do you find the defendant New Jax was negligent in the repair process through the common element roof above plaintiffs' Unit 5-C? Answer: Yes.
Do you find that the negligence of New Jax was a legal cause of damage to the plaintiffs? Answer: Yes.
Please state the sum of money that would reasonably compensate plaintiffs for the following: LOSS OF USE. Answer: $1,185,700.
On New Jax's reconventional demand, the jury found plaintiffs owed New Jax condo assessment fees for the period of April 1, 2008 through September 15, 2015, in the amount of $63,563.15.
On March 24, 2016, the trial court rendered a final judgment as follows: on the main demand, judgment in favor of plaintiffs and against defendants, in solido , in the amount of $1,185,700, with interest from March 28, 2012; on the reconventional demand, judgment in favor of defendants and against plaintiffs in the amount of $63,563.15, with interest from October 31, 2012; and reserving the parties' claims for attorneys' fees and costs to be determined in later proceedings.
On March 31, 2016, New Jax filed a motion for new trial or, in the alternative, a motion for remittitur. After hearing arguments on the motion, the trial court rendered judgment on May 23, 2016, denying New Jax's motion for new trial and motion for remittitur.
Defendants then filed a timely suspensive appeal from the trial court's March 24, 2016 judgment in favor of plaintiffs for loss of use damages and the trial court's May 23, 2016 judgment denying the motion for new trial. After the lodging of the record of this appeal, plaintiffs filed a timely answer to the appeal, seeking reversal of the trial court's March 2, 2016 pre-trial judgment granting Lafayette's motion in limine to preclude plaintiffs from presenting evidence of a bad faith claim under La. R.S. 22:1892(A)(4) at trial.
While the appeal of the trial court's March 24, 2016 judgment was pending before this Court, plaintiffs filed a motion to tax costs, seeking all of the costs of the trial to be assessed against defendants. On January 6, 2017, the trial court rendered judgment granting, in part, plaintiffs' motion to tax costs and assessing court costs and specified expert fees against defendants in the amount of $49,862.92. Defendants then timely appealed the trial court's January 6, 2017 judgment.
The two appeals were consolidated by this Court on its own motion.
DISCUSSION
Defendants' Appeal of March 24, 2016 Judgment
Defendants raise joint assignments of error regarding plaintiffs' claim for loss of use, whether plaintiffs' claim sounds in tort or contract, and prescription. Each defendant also raises separate assignments of *384 error. New Jax assigns error to the trial court's exclusion of trial testimony regarding rental values and to the trial court's pre-trial judgment finding no policy coverage for attorney's fees awarded as damages under its insurance policy with Lafayette. Finally, in its own defense of the judgment, Lafayette asserts policy coverage defenses to its liability for the loss of use damages. We begin our discussion by addressing the joint assignments of error.
Right to Claim Loss of Use
In their first assignment of error, defendants argue that the trial court erred, as a matter of law, in allowing plaintiffs, two limited liability companies, to recover damages for loss of use. During pre-trial litigation, this legal issue of plaintiffs' right to claim loss of use was raised by both parties in cross-motions for partial summary judgment.[5] After an initial hearing on the issue, the trial court denied both parties' motions.[6] Subsequently, the parties filed a joint motion for reconsideration of their cross motions for partial summary judgment on this unresolved issue. After a second hearing, the trial court granted plaintiffs' motion for partial summary judgment on the right to claim loss of use and to present evidence of the ready market value of substitute property as the measure of damages for loss of use.[7]
This Court reviews a trial court's ruling on a motion for summary judgment de novo . Sutherland v. Alma Plantation, L.L.C. , 15-1136, p. 4 (La. App. 4 Cir. 5/4/16), 193 So.3d 1178, 1181. "Appellate courts use the 'same criteria that govern the trial court's consideration of whether summary judgment is appropriate.' " Weintraub v. State Farm Fire & Cas. Co. , 08-0351, p. 2 (La. App. 4 Cir. 10/29/08), 996 So.2d 1195, 1196-97, quoting Supreme Servs. and SpecialtyCo., Inc. v. Sonny Greer, Inc. , 06-1827, p. 4 (La. 5/22/07), 958 So.2d 634, 638. Pursuant to La. C.C.P. art. 966(B)(2), a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law.[8] The party moving for summary judgment bears the burden of proof. La. C.C.P. art. 966(C)(2).[9]
*385 The adverse party bears the burden to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. Id.
In addition, when the question before the appellate court is whether the trial court erred in ruling on an issue of law, we conduct a de novo review of the record, giving deference to the trial court's factual findings which will not be disturbed absent manifest error. Wirthman-TAG Constr. Co., L.L.C. v. Hotard , 14-1394, 14-1395, p. 3 (La. App. 4 Cir. 8/19/15), 176 So.3d 429, 432, quoting Wooley v. Lucksinger , 09-0571, 09-0584-86, p. 49 (La. 4/1/11), 61 So.3d 507, 554.
Defendants argue that the trial court erred in granting plaintiffs' motion for partial summary judgment and allowing plaintiffs to claim loss of use damages, because Louisiana law does not permit corporate entities such as plaintiffs to recover non-pecuniary, non-economic loss of use damages. Defendants assert that corporate entities can suffer only economic damages and, in this case, it is undisputed that plaintiffs did not suffer any economic loss to the entities as a result of the loss of use of the condo. Thus, defendants argue that plaintiffs are not entitled to claim non-pecuniary damages for loss of use as a matter of law.
In support of their argument, defendants rely primarily on federal jurisprudence. See AT & T Corp. v. Columbia Gulf Transmission Co. , (W.D. La. 2008), unpub. , 2008 WL 4585439 (holding that a corporate entity is not entitled to recover damages for loss of use when there is no evidence that the corporation suffered lost revenues or profits); Kelly v. Porter, Inc. , 687 F.Supp.2d 632, 638 (E.D. La. 2010) (holding that a juridical entity can suffer only economic damage and cannot recover non-pecuniary damages and dismissing plaintiff LLC's claim for loss of use); Walle Corp. v. Rockwell Graphics Sys., Inc. , (E.D. La. 1992), 1992 WL 245963, at *5 (holding that a corporation cannot recover inconvenience damages or any non-pecuniary damages). Defendants also cite one Louisiana state case, Whitehead v. American Coachworks, Inc. , 02-0027 (La. App. 1 Cir. 12/20/02), 837 So.2d 678, in which the First Circuit reversed a general damages award in favor of the corporate plaintiff for loss of enjoyment and use of a vehicle, mental anguish, and inconvenience.[10] The First Circuit reasoned that "State Farm, a corporation, is incapable of experiencing loss of enjoyment, mental anguish, and inconvenience." Whitehead , 02-0027, p. 6 (La. App. 1 Cir. 12/20/02), 837 So.2d at 682, citing City of New Orleans , 241 So.2d at 10.
Although federal jurisprudence may be instructive in certain areas where Louisiana *386 law and jurisprudence is silent, we find, in this case, that the trial court correctly interpreted and applied the controlling precedent of Chriss v. Manchester Ins. & Indem. Co. , 308 So.2d 803 (La. App. 4th Cir. 1975). In Chriss , this Court held that property owners are entitled to be compensated for the loss of use of their property and distinguished such damages from those awarded for mental anguish. This Court reasoned as follows:
Louisiana courts have allowed recovery of damages for mental anguish in cases involving other torts, such as trespass, assault, and other acts involving the violation of recognized individual rights. These compensatory damages have been awarded whether or not the violation causes pecuniary damage, since such violations self-evidently result in mental anguish.
In negligence cases involving injury to property this court has limited recovery of damages for emotional stress (unaccompanied by physical injury) to those cases where the disturbance causes bodily harm or illness.
...
Damages are recoverable, however, for loss of normal use of the building.
... Furthermore, damages for loss of use are recoverable whether the property is used for business or personal purposes.
The normal measure of damages for loss of use is the rental value of similar property and perhaps necessary incidental expenses. It is not necessary, however, that a plaintiff actually rent substitute property in order to recover damages due for loss of use. Rental (which accomplishes the substitution of the use of similar property for that of the injured property) does not determine entitlement to damages, but only provides a fair measure of damages in appropriate cases.
...
The period of compensatory loss of use is the time required to secure the repair of the property in the exercise of proper diligence.
Chriss , 308 So.2d at 805-06 (internal citations omitted).
As reasoned by this Court in Chriss , there is a distinction between a mental anguish claim allegedly related to property damage and a claim for the loss of use of property. A non-economic loss of use occurs when the owner's normal use of the property is restricted by defendant's acts and, consequently, the owner's rights of ownership are disturbed.
The ownership of property includes the rights to possess it, use it, enjoy the use of it, and dispose of it. See Eagle Pipe and Supply, Inc. v. Amerada Hess Corp. , 10-2267, 10-2272, 10-2275, 10-2279, 10-2289, pp. 10-11 (La. 10/25/11), 79 So.3d 246, 258 ; Giroir v. Dumesnil , 248 La. 1037, 1050, 184 So.2d 1, 6 (1966). When any of these rights of ownership are disturbed by an injury or damage to the property through the acts of another, the owner of the property obtains a personal right of action against the one causing the damage. Eagle Pipe , 10-2267, pp. 42-43, 79 So.3d at 277; see also , La. C.C. art. 2315 ("Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."). In this case, plaintiffs are juridical persons with full rights of ownership in the property at issue. See La. C.C. 479 ; Ogea v. Merritt , 13-1085, p. 6 (La. 12/10/13), 130 So.3d 888, 894 ; see also La. R.S. 12:1301. As such, plaintiffs are entitled to bring a claim against defendants for the damage to their property and to their rights of ownership.
*387 Furthermore, we find the damages claimed for the loss of use of property are compensatory in nature. Compensatory damages are those awarded on the basis of the loss suffered and are designed to replace the loss caused by the wrong or injury.[11] See McGuire v. Kelly , unpub. , 10-0562 (La. App. 1 Cir. 1/30/12), 2012 WL 602366, *16. "Compensatory damages are further divided into the broad categories of special damages and general damages. Special damages are those which have a 'ready market value,' such that the amount of the damages theoretically may be determined with relative certainty." McGee v. A C And S. Inc., 05-1036, p. 3 (La. 7/10/06), 933 So.2d 770, 773. By contrast, general damages include those things which are inherently speculative in nature and cannot be measured definitively in terms of money. Id. , 05-1036, pp. 3-4, 933 So.2d at 774. Accordingly, loss of intellectual or physical enjoyment, or other loss of lifestyle, fall into the category of general damages because they are inherently speculative and have no measurable monetary value; however, loss of use of property falls within the category of special damages because it can be measured fairly and to a degree of relative certainty by the rental value of substitute property. See McGee , 05-1036, p. 4, 933 So.2d at 774 ; Chriss , 308 So.2d at 805-06 ; see also , Nunez v. St. Bernard Parish Fire Dep't , 519 So.2d 857, 862 (La. App. 4th Cir. 1988). In this case, plaintiffs sought to be compensated for the loss of use of their property, as a result of defendants' negligence, which was measured to a degree of reasonable certainty by the rental value of substitute property.
In light of the applicable law and jurisprudence, we find no error in the trial court's judgment granting plaintiffs' motion for partial summary judgment and allowing plaintiffs to recover loss of use damages as measured by the rental value of substitute property. Thus, we find no merit in defendants' first assignment of error.
Tort Claim or Contract Claim
Next, defendants raise two assignments of error in which they argue that the trial court erred in finding that plaintiffs established a cognizable tort claim and in allowing the jury to award tort damages for a claim that sounds solely in contract.
In a motion for directed verdict, at the close of plaintiffs' case-in-chief, defendants argued that plaintiffs failed to establish defendants' liability in tort, that the evidence only supported a claim for breach of contract as set forth in the New Jax Condominium Association Declaration and By-Laws, and that plaintiffs could not recover loss of use damages for a claim that sounds solely in contract. After taking the matter under advisement,[12] the trial court *388 denied defendants' motion for directed verdict finding that the evidence supported a claim sounding in both breach of contract and tort. Then, subsequent to the jury verdict awarding plaintiffs loss of use tort damages, defendants filed a motion for new trial asserting that the verdict was contrary to the law and the evidence because no general tort duty was established to support the jury's finding of negligence. In denying the motion for new trial, the trial court found that there was sufficient law and evidence to support the jury's unanimous verdict.
On appeal, defendants assign error to both trial court rulings, arguing that the trial court erred in submitting plaintiffs' claim to the jury and in upholding the award of torts damages in a breach of contract case. We begin by discussing the trial court's denial of defendants' motion for directed verdict.
A motion for directed verdict is appropriately made at the close of the evidence offered by the opposing party and should be granted only when, after considering all of the evidence in the light most favorable to the non-moving party, the facts and evidence point so strongly and overwhelmingly in favor of the moving party that reasonable minds could not arrive at a contrary verdict. Hammons v. St. Paul , 12-0346, 12-0347, p. 5 (La. App. 4 Cir. 9/26/12), 101 So.3d 1006, 1010 ; Simon v. American Crescent Elevator Co. , 99-2058, p. 14 (La. App. 4 Cir. 4/26/00), 767 So.2d 64, 73-74. If, however, there is evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the case submitted to the jury. Baudy v. Travelers Indem. Co. of Connecticut , 13-832, p. 8 (La. App. 5 Cir. 4/9/14), 140 So.3d 125, 131.
The trial court has much discretion in determining whether or not to grant a motion for directed verdict. Everhardt v. Louisiana Dep't of Transp. and Dev. , 07-0981, p. 13 (La. App. 4 Cir. 2/20/08), 978 So.2d 1036, 1047. On appeal from a ruling denying a motion for directed verdict, "[t]he question to be asked by the appellate court is not whether a plaintiff proved his case by a preponderance of the evidence, but rather, whether upon reviewing the evidence submitted, the court could conclude that reasonable persons could not have reached a verdict in favor of the plaintiff." Id. ; Hammons , supra ."[T]he propriety of a directed verdict must be evaluated in light of the substantive law related to the claims."
*389 Wendel v. Travelers Ins. Co. , 14-0002, p. 4 (La. App. 4 Cir. 10/8/14), 151 So.3d 828, 833.
On defendants' motion for directed verdict, the question before the trial court was whether plaintiffs presented sufficient evidence to establish a tort claim or whether plaintiffs' claim sounds solely in contract.[13]
Under Louisiana law, when a party has been damaged by the conduct of another arising out of a contractual relationship, the party may have two remedies, an action in contract or an action in tort, and the party may elect to recover damages under either. Mentz Constr. Services, Inc. v. Poche , 11-1474, p. 5 (La. App. 4 Cir. 3/14/12), 87 So.3d 273, 276 ; Federal Ins. Co. v. Insurance Co. of North America , 262 La. 509, 512, 263 So.2d 871, 872 (1972) ; see also La. C.C. art. 1994 ; La. C.C. art. 2315. This Court has stated the distinction between an action on a contract and a tort action as follows:
[W]here a cause of action arises from breach of a promise set forth in contract, the action is "ex contractu", but where it arises from a breach of duty growing out of contract, it is "ex delicto." Thus, the main distinction between an action on a contract and a tort action is that the former flows from the breach of a special obligation contractually assumed by the obligor, whereas the latter flows from the violation of a general duty owed to all persons.
Mentz , 11-1474, p. 5, 87 So.3d at 276-77, citing Certain Underwriters at Lloyd's, London v. Sea-Lar Mgmt. , 00-1512, p. 6 (La. App. 4 Cir. 5/9/01), 787 So.2d 1069, 1074 ; see Ridge Oak Development, Inc. v. Murphy , 94-0025, p. 4 (La. App. 4 Cir. 6/30/94), 641 So.2d 586, 588.
Moreover, it is well settled Louisiana law that the same acts or omissions causing damage to another may constitute breaches of both general and contractual duties, and a plaintiff may assert both an action in contract and in tort, where the facts and evidence reveal the breach of a contractual duty and active negligence. Dubin v. Dubin , 25,996, p. 5 (La. App. 2 Cir. 8/17/94), 641 So.2d 1036, 1039-40 ; Ridge Oak , 94-0025, p. 4, 641 So.2d at 588 ; Borden, Inc. v. Howard Trucking Co., Inc. , 454 So.2d 1081, 1096 (La. 1983) ("[A] party can incur liability in tort, notwithstanding a contractual relationship between parties, for consequential damages (here, loss of use) where the act causing the damage constitutes both a breach of contract and legal fault."). Generally, where a person neglects to fulfill obligations due under a contract, that person commits a passive breach of the contract. Dubin , 25,996, p. 5, 641 So.2d at 1040. "There are, however, contract situations where there occur damages by reason of fault which are distinct from and/or in addition to breach of a [contract]." Lafleur v. John Deere Co. , 491 So.2d 624, 630 (La. 1986). Thus, there are situations in which a person who negligently performs a contractual obligation commits active negligence and thus an active breach of the contract. Dubin , 25,996, p. 6, 641 So.2d at 1040, citing Huggs, Inc. v. LPC Energy, Inc. , 889 F.2d 649 (5th Cir. 1989) ; Hennessy v. South Central Bell Telephone Co. , 382 So.2d 1044 (La. App. 2d Cir. 1980). Whereas a passive breach of contract gives rise solely to an action in contract, an active breach of contract may also support an action in tort under La. C.C. art. 2315. Dubin , 25,996, p. 6, 641 So.2d at 1040.
*390 In denying defendants' motion for directed verdict, the trial court noted its reliance on applicable jurisprudence, specifically Dubin , supra , in finding that plaintiffs had presented sufficient evidence to establish an active breach of contract that sounds in contract and in tort.
At trial, plaintiffs offered testimony from three experts regarding the condition of the roof and the necessary repairs, the damage to the condo from the continuous water leaks, and the financial management of New Jax during the five year period that the condo was uninhabitable. First, plaintiffs presented the testimony of Greg Fisher, a roofing expert whom plaintiffs hired in July 2012 to inspect the roof and offer recommendations. Mr. Fisher testified at length regarding the complexity of the roof system that, in his opinion, necessitated hiring a professional roofing contractor to complete the repairs. Upon his inspection of the roof in July 2012, Mr. Fisher observed that the only repairs that had been attempted were done by the general maintenance manager for New Jax and no professional roofing company had been hired. During subsequent inspections from October 2012 to October 2013, Mr. Fisher found a consistent lack of progress in the repairs to the roof, despite having offered his recommendations to the maintenance manager that a competent roofer be hired to perform certain repairs. Mr. Fisher also discussed the findings and recommendations from the roof assessment prepared by BE-CI in August 2014; he noted that it was a thorough, complete report that revealed the source of the leaks and detailed recommendations for repairs. Finally, based on his observations and experience, Mr. Fisher stated his opinion that the necessary roof repairs could have been completed within three to six months of when the leaks were first reported if New Jax had hired a roofing consultant and competent, professional roofer at that time.
Harold Asher, an expert forensic accountant, testified that he sought to review New Jax's financials from July 2009 through March 2014 to determine whether New Jax had sufficient funding to repair or replace the roof of the building during that time. However, Mr. Asher learned that New Jax did not maintain a disbursement ledger, income or balance sheets, or proper financial documentation expected to be maintained by an incorporated condominium association. After recreating income statements and preparing a comparative budget analysis from the bank statements and documents New Jax did provide, Mr. Asher concluded that New Jax was financially mismanaged and distressed during the time period he examined from 2009 through 2013.
Cal Grevemberg, an expert on mold identification and remediation, testified regarding the air quality and mold inspections he conducted of the condo and other areas of the building in 2011 and in 2013. After the first inspection, he concluded that the mold contamination in the condo posed a health risk to any occupant; after the subsequent inspection, he found that the mold contamination had worsened from the continuous water intrusion.
Mr. Jordan testified that beginning in July 2009, when he informed New Jax that the condo had become uninhabitable as a result of the water leaks and associated damage, New Jax continually failed to take reasonable steps to repair or replace the roof and, consequently, the water leaks and damage to the condo continued unabated for years. Mr. Jordan stated that in response to his emails informing New Jax of ongoing leaks and requesting updates, New Jax provided vague responses that work was being done, without naming any contractors or roofers or stating a timeline *391 for repairs. Mr. Jordan further testified that the first progress toward repairs came in mid-2014, after the election of all new Board members for New Jax; soon thereafter, Mr. Jordan learned that the new Board hired BE-CI to assess the roof and Acadian Roofing to make the necessary repairs. After the roof repairs proved successful in May 2015, he testified that the interior repairs of the condo required Board approval, and the condo was fully repaired for use in September 2015.
Based on our review of the evidence presented, viewed in the light most favorable to the plaintiffs, we find there is sufficient evidence to conclude that plaintiffs made a prima facie case of active negligence or active breach of contract by New Jax. Accordingly, plaintiffs' tort claim was properly before the jury and we find no error in the trial court's denial of defendants' motion for directed verdict.
Regarding the trial court's denial of their motion for new trial, defendants argue that the trial court erred because the jury's verdict finding defendants liable for negligence is contrary to the law and evidence. On appeal, we review a trial court's ruling on a motion for new trial under an abuse of discretion standard. Pitts v. Louisiana Medical Mutual Ins. Co. , 16-1232, p. 10 (La. 3/15/17), 218 So.3d 58, 66. Although the granting of a new trial is mandatory if the trial court finds the verdict is contrary to the law and evidence, pursuant to La. C.C.P. art. 1972(1), the jurisprudence interpreting this provision recognizes the trial judge's discretion in determining whether the jury's verdict is contrary to the law and evidence. Davis v. Witt , 02-3102, 02-3110, p. 16 (La. 7/2/03), 851 So.2d 1119, 1130.[14] "Generally, a trial judge should grant a motion for new trial because a jury verdict is contrary to the law and evidence when the judge's examination of the record, while exercising his discretion, convinces him that the judgment would result in a miscarriage of justice." Zatarain v. WDSU-Television, Inc. , 95-2600, p. 3 (La. App. 4 Cir. 4/24/96), 673 So.2d 1181, 1183. However, the trial court must exercise considerable caution not to overstep its duty in overseeing the administration of justice and usurp the jury's role as fact finder. Davis v. Wal-Mart Stores, Inc. , 00-0445, p. 10 (La. 11/28/00), 774 So.2d 84, 93, citing Gibson v. Bossier City General Hospital , 594 So.2d 1332, 1336 (La. App. 2d Cir. 1991). Accordingly, a motion for new trial based on a contention that the verdict is contrary to the law and evidence should be denied if the verdict is supportable by any fair interpretation of evidence, and a trial court judgment denying a motion for new trial should not be reversed unless the appellate court finds that the trial court abused its great discretion. Zatarain , 95-2600, p. 3, 673 So.2d at 1183.
In their motion for new trial, defendants argued that the trial court erred in allowing a negligence claim to be submitted to the jury without a legal finding that defendants owed a duty to plaintiffs. At the hearing on the motion, the trial court noted the existence of a general tort duty owed by New Jax under the facts of this case and denied the motion for new trial. On appeal, defendants argue that the trial court erred in finding that a general tort duty existed and, moreover, the jury's verdict finding defendants liable for negligence was not supported by the law.
"A threshold issue in any negligence action is whether the defendant *392 owed the plaintiff a duty." Ponceti v. First Lake Properties, Inc. , 11-2711, p. 2 (La. 7/2/12), 93 So.3d 1251, 1252. "The existence of the duty is a question of law." Ogea v. Merritt , 13-1085, p. 24 (La. 12/10/13), 130 So.3d 888, 905. "Whether a legal duty exists, and the extent of that duty, depends on the facts and circumstances of the case, and the relationship of the parties." Joseph v.Dickerson , 99-1046, 99-1188, p. 7 (La. 1/19/00), 754 So.2d 912, 916. "[T]he inquiry is whether the plaintiff has any law-statutory, jurisprudential, or arising from general principles of fault-to support his claim." Ogea , 13-1085, p. 24, 130 So.3d at 905, quoting Faucheaux v. Terrebonne Consol. Government , 615 So.2d 289, 292 (La. 1993).
As noted by plaintiffs, the Louisiana Condominium Act imposes a legal obligation upon condominium associations to maintain, repair, or replace the common elements of the condominium building. La. R.S. 9:1123.107. In addition, Louisiana law recognizes a general duty of the owner or custodian of property to exercise reasonable care to prevent reasonably foreseeable injury or damage to another resulting from a known vice, defect, or ruin of the property. See La. C.C. 2317.1 ; see also , Moore v. Kenilworth/Kailas Properties , 03-0738, p. 8 (La. App. 4 Cir. 1/7/04), 865 So.2d 884, 890 (finding that landlord defendant had both a contractual duty and a tort duty to remedy the known defect in the property to prevent injury); McCrory Corp. v. Latter , 331 So.2d 577, 579 (La. App. 1st Cir. 1976) (finding that the failure of a landlord's obligation to keep the basement waterproof was a breach of contract and a breach of the statutory tort duties imposed by law). Thus, in consideration of statutory law and Louisiana tort law, we find no error in the trial court's conclusion that defendants owed a tort duty to plaintiffs.
Furthermore, based on our review of the record and the applicable law, we find that the jury's verdict finding defendants liable for negligence is supportable by a fair interpretation of the evidence. At trial, plaintiffs presented testimony and evidence establishing that, in July 2009, New Jax had knowledge of the defective roof and the damages occasioned by it, including plaintiffs' loss of use of the condo. Plaintiffs also presented testimony and evidence sufficient to find that New Jax failed to exercise reasonable care to prevent further damage or injury to plaintiffs, and that damages continued to result from New Jax's negligent efforts to repair the roof. Therefore, based on the evidence and applicable law, we find no abuse of discretion in the trial court's denial of defendants' motion for directed verdict on the basis that the jury's verdict is contrary to the law and evidence.
Prescription
Next, defendants argue that the trial court erred in finding that plaintiffs' claim constitutes a continuing tort and denying defendants' exception of prescription. Defendants contend that, even assuming a cognizable tort claim was established, plaintiffs' claim for damages arises from separate, distinct water leak events, occurring over multiple years, each giving rise to a separate tort claim for damage to immovable property with a one-year prescriptive period. Thus, defendants argue that any claim arising from an event that occurred more than one year prior to suit being filed was prescribed. Further, defendants argue that the facts and evidence do not support a finding that plaintiffs' claim constitutes a continuing tort.
A peremptory exception of prescription may be pleaded at any stage of the proceeding in the trial court prior to the submission of the case for a decision. La. C.C.P. arts. 927 and 928(B). "Ordinarily, *393 the party pleading the exception of prescription bears the burden of proving the claim has prescribed." Hogg v. Chevron USA, Inc. , 09-2632, 09-2635, p. 7 (La. 7/6/10), 45 So.3d 991, 998. If, however, prescription is evident on the face of the pleadings, then the burden shifts to the plaintiff to show that prescription has been interrupted or suspended and the claim has not prescribed. Id. ; see Kelley v. General Ins. Co. of America , 14-0180, p. 6 (La. App. 1 Cir. 12/23/14), 168 So.3d 528, 534.
When evidence is introduced and evaluated at the trial of a peremptory exception of prescription, the trial court's findings of fact are reviewed under the manifest error standard of review. Lomont v. Bennett , 14-2483, p. 8 (La. 6/30/15), 172 So.3d 620, 627. Accordingly, if the trial court's findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id. Furthermore, "the standard controlling the review of the exception of prescription requires the appellate court to strictly construe the statutes against prescription and in favor of the claim that is said to be extinguished." Robinson v. Westin Hotel , 12-1454, p. 4 (La. App. 4 Cir. 3/20/13), 177 So.3d 715, 718 ; see Bosarge v. DePaul/Tulane Behavioral Health Center , 09-1345, p. 2 (La. App. 4 Cir. 5/19/10), 39 So.3d 790, 792.
Ordinarily, "[p]rescription runs against all persons unless exception is established by legislation." La. C.C. art. 3467. In Louisiana, tort claims are generally subject to a one year prescriptive period that commences to run from the day injury or damage is sustained. La. C.C. art. 3492. In cases involving allegations of tortious conduct causing damage to immovable property, the one year prescriptive period "commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage." La. C.C. art. 3493. Hogg , 09-2632, 09-2635, p. 7, 45 So.3d at 997.
However, pursuant to the continuing tort doctrine, where the wrongful, damaging conduct is of a continuous nature and gives rise to successive damages, prescription does not begin to run until the wrongful conduct ceases. Scott v. Zaheri , 14-0726, p. 11 (La. App. 4 Cir. 12/3/14), 157 So.3d 779, 786 ; Crump v. Sabine River Authority , 98-2326, p. 10 (La. 6/29/99), 737 So.2d 720, 728. The concept of the continuing tort has its roots in property damage cases and requires that both the operating cause of the injury and the resulting damages be continuous. Crump , 98-2326, p. 7, 737 So.2d at 726 ; see In re Medical Review Panel for Claim of Moses , 00-2643, pp. 15-16 (La. 5/25/01), 788 So.2d 1173, 1183. In determining whether a case involves a continuing tort, "[t]he inquiry is essentially a conduct-based one, asking whether the tortfeasor perpetuates the injury through overt, persistent, and ongoing acts." Hogg , 09-2632, 09-2635, p. 16, 45 So.3d at 1003. Consequently, where the wrongful conduct of the tortfeasor ceases, but the plaintiff continues to experience injury in the absence of any ongoing wrongful acts by the tortfeasor, the courts have found no continuing tort. Id. , 09-2632, 09-2635,p. 21, 45 So.3d at 1005. However, "courts have found torts to be continuous in nature where each individual act would not necessarily give rise to a cause of action; but instead, the cumulative effect of regularly-occurring or continuous actions results in successive damages from day to day." Scott , 14-0726, p. 11, 157 So.3d at 786 ; see Bustamento v. Tucker , 607 So.2d 532 (La. 1992) (finding that cumulative, continuous acts of harassment constituted a continuing tort analogous to continuing trespass or nuisance);
*394 Wilson v. Hartzman , 373 So.2d 204 (La. App. 4th Cir. 1979) (finding that plaintiff's continuous exposure to silica dust in the workplace over a decade involved continuing and repeated wrongful acts that would be regarded as a single wrong and cognizable as a continuing tort). The application of the continuing tort doctrine depends on the facts of each case.
In Lopez v. House of Faith Non-Denomination Ministries , 09-1147 (La. App. 4 Cir. 1/13/10), 29 So.3d 680, plaintiffs brought an action against the neighboring property owner whose damaged building fell onto plaintiff's house and remained in contact with their house for more than a year until defendant's building was demolished. Plaintiffs alleged that defendant's continued failure to repair the defective property and failure to exercise reasonable care to prevent damage to plaintiff's property constituted a continuing tort. Upon review of the relevant jurisprudence, this Court agreed and found that defendant's continuous failure to repair its building for more than a year resulted in ongoing, successive damage to plaintiffs' property; consequently, this Court held that prescription did not commence until the continuous negligent conduct abated by virtue of the building being demolished. Id. 1147, p. 8, 29 So.3d at 684.
In finding that the continuing tort doctrine applied, the Lopez Court found two cases instructive. In Estate of Patout v. City of New Iberia , 97-1097, 97-1098, 97-1070 (La. App. 3 Cir. 3/6/98), 708 So.2d 526, the City-defendant operated a landfill adjacent to plaintiff's property and, over a period of several years, continually pushed garbage onto plaintiff's property. The Court held that the continuous trespass of the City pushing garbage onto plaintiff's property and the continued presence of the landfill refuse over a period of several years constituted a continuing tort and prescription did not begin to run until the garbage was removed. Id. , 97-1097, 97-1098, 97-1070, 708 So.2d at 531. In Risin v. DNC Investments, L.L.C. , 05-0415 (La. App. 4 Cir. 12/7/05), 921 So.2d 133, the defendant/landlord failed to take action to abate plaintiff's exposure to lead paint in his apartment, which ended only when plaintiff moved out. This Court found that the defendant breached an ongoing duty to provide safe housing to tenants, and the continuous failure to abate the lead exposure was continuous tortious conduct resulting in continuous damages to plaintiff. Risin , 05-0415, p. 8, 921 So.2d at 138.
In this case, defendants argue that even if plaintiffs' damages from the roof leaks were ongoing, New Jax's conduct was not tortious or continuously tortious, and, consequently, there was no continuing tort. Defendants contend that the testimony of Mike Storms established that New Jax responded to each complaint about the water leaks in the condo and that New Jax made reasonable efforts to repair the roof. Defendants argue that plaintiffs did not satisfy their burden of showing continuous tortious conduct giving rise to successive damages. We disagree.
From our review of the record, we find that plaintiffs established a pattern of negligent conduct by New Jax and that cumulative, continuous tortious conduct gave rise to successive damages from 2009 until the roof was successfully repaired in 2015. Mr. Jordan's testimony and the email correspondence between him and New Jax establish that the water leaks were ongoing from July 2009, when he first reported that the condo had become uninhabitable, and that New Jax continually failed to take reasonable efforts to repair the roof, stop the water leaks, and prevent the successive, worsening damage to plaintiffs' condo. In addition, Greg Fisher's testimony and the findings in the BE-CI report revealed the lack of reasonable efforts taken *395 by New Jax to hire a competent roofer and to take the necessary steps to abate the continuous damage to plaintiffs' condo. The entire record reflects that the damage to plaintiffs' property continued unabated for seventy-five months by virtue of New Jax's continuous, negligent conduct.
Based on our review of the record and the applicable jurisprudence, we find no error in the trial court's finding of a continuing tort and its denying defendants' exception of prescription.
Excluded Testimony on Rental Values
Next, New Jax, not joined by Lafayette, argues that the trial court erred in excluding testimony from Steve Schmidt regarding rental values of condominiums in the French Quarter. New Jax argues that Mr. Schmidt's testimony was admissible opinion testimony from a lay witness, pursuant to La. C.E. art. 701, and that the exclusion of his testimony prejudiced defendants.
The trial court is vested with great discretion concerning the admissibility of evidence, and the trial court's decision to admit or exclude evidence will not be reversed on appeal in the absence of a clear abuse of discretion. Richardson v. Richardson , 07-0430, p. 9 (La. App. 4 Cir. 12/28/07), 974 So.2d 761, 769. Further, the trial court is vested with much discretion in determining whether to allow lay witness testimony as to an opinion or inference, in accordance with La. C.E. art. 701. Regional Transit Authority v. Lemoine , 93-1896, 93-1897, p. 7 (La. App. 4 Cir. 11/16/95), 664 So.2d 1303, 1307.
"Generally, a witness not testifying as an expert may not give testimony in the form of opinions or inferences." Short v. Terminix Pest Control Inc. , 11-2293, p. 3 (La. App. 1 Cir. 9/21/12), 104 So.3d 119, 121. However, La. C.E. art. 701 provides an exception to the general rule and permits a lay witness to give testimony in the form of opinions or inferences insofar as those opinions or inferences are rationally based on the witness' perception and helpful to a clear understanding of his testimony or the determination of a fact in issue. Id.
During plaintiffs' case-in-chief, Samara Poche testified as an expert in the area of residential real estate leasing in Louisiana.[15] Mrs. Poche explained her experience in the field and her methodology for determining comparable rental values for properties such as plaintiffs' condo. Based on her review of historical and current rental values of comparable luxury condos in the French Quarter, Mrs. Poche provided comparable rental values for July 2009 through September 2015, the period of time plaintiffs lost the use of the condo. After presenting her findings, Mrs. Poche testified that the total market value for a comparable, replacement condo was $1,185,700. Defendants did not cross-examine Mrs. Poche.
During defendants' case-in-chief, Mr. Schmidt testified regarding his knowledge, as a member of the Board of New Jax and a unit owner, of the water leaks in plaintiffs' condo and New Jax's efforts to make repairs. While questioning Mr. Schmidt, defense counsel sought to elicit Mr. Schmidt's "assessment" of the estimated rental values for plaintiffs' condo as presented by Mrs. Poche. Plaintiffs objected to the lack of foundation given that defendants did not list or offer Mr. Schmidt as an expert witness regarding rental values. The trial court sustained plaintiffs' objection *396 and excluded any testimony from Mr. Schmidt regarding his opinion of real estate rental values. Later, in explaining its ruling, the trial court stated that defendants did not identify Mr. Schmidt as an expert witness in the pre-trial order or, prior to his testimony, disclose that Mr. Schmidt was being called to offer lay opinion testimony. However, the trial court allowed defendants to proffer Mr. Schmidt's testimony regarding his opinion of comparable rental values for plaintiffs' condo.
The record reflects that, prior to the first trial setting, plaintiffs identified Mrs. Poche as an expert witness regarding real estate rental values and defendants filed a motion in limine to exclude her testimony, which was denied. Although defendants argue that the deadline to identify expert witnesses had passed prior to the trial court's ruling denying their motion in limine, the record does not reflect that defendants ever sought to extend the discovery deadline for the purpose of obtaining a rebuttal expert witness.
In addition, in the pre-trial order, defendants listed Mr. Schmidt as a fact witness but did not identify real estate or rental values as part of his area of testimony. However, the record reflects that defendant had ample time and opportunity prior to trial to identify Mr. Schmidt as a witness to testify regarding his personal knowledge of real estate rental values, either in rebuttal to Mrs. Poche's testimony or as a lay expert.
Based on our review of the record, including Mr. Schmidt's proffered testimony, we cannot say that the trial court abused its vast discretion in excluding testimony from Mr. Schmidt regarding comparable real estate rental values. Policy Coverage for Plaintiffs' Attorney's Fees
In New Jax's final assignment of error, New Jax argues that the trial court erred in granting partial summary judgment in favor of Lafayette finding that the Lafayette insurance policy does not provide coverage for attorney's fees awarded as damages.
As discussed previously, this Court reviews a trial court's ruling on a motion for summary judgment de novo , applying the same criteria that govern the trial court's consideration of whether summary judgment is appropriate, i.e., whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. Sutherland , 15-1136, p. 4, 193 So.3d at 1181 ; Weintraub , 08-0351, p. 2, 996 So.2d at 1196-97 ; see La. C.C.P. art. 966(B)(2).
Notably, New Jax does not challenge the trial court's interpretation of the insurance policy or its finding that the policy does not provide coverage for attorney's fees awarded as damages. Rather, New Jax argues that the trial court erred in failing to find that Lafayette had waived its right to assert the policy exclusion of attorney's fees, because Lafayette failed to specifically plead that policy exclusion as an affirmative defense and failed to reserve it as a coverage defense in its reservation of rights letter to New Jax.
Under Louisiana law, "[w]aiver occurs when there is an existing right, a knowledge of its existence and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." Tate v. Charles Aguillard Ins. & Real Estate, Inc. , 508 So.2d 1371, 1374 (La. 1987) ; see Steptore v. Masco Constr. Co., Inc. , 93-2064, p. 4 (La. 8/18/94), 643 So.2d 1213, 1216. "Waiver of coverage defenses results when an insurer, with knowledge of facts indicating non-coverage, undertakes to defend an insured without reserving its rights to deny *397 coverage." Arceneaux v. Amstar Corp. , 10-2329, p. 25 (La. 7/1/11), 66 So.3d 438, 455.
Our review of the record reflects that Lafayette issued a reservation of rights letter to New Jax on February 29, 2012. At that time, the instant suit had not been filed, but the letter specifically acknowledges receipt of a copy of plaintiffs' petition naming New Jax as a defendant. The letter informs that counsel has been assigned to represent New Jax in this matter. Further, it states, "[n]either our defense of the case, investigation, nor any attempts at negotiating or compromising a settlement should be construed as a waiver preventing us from raising any coverage defense under this policy." Finally, Lafayette specifically reserved its right under the policy, "including the right to deny coverage, withdraw from the defense of this lawsuit or file a declaratory judgment if so warranted."
The record further reflects that plaintiffs' original petition naming New Jax as a defendant did not assert a claim for attorney's fees as damages. In plaintiffs' first supplemental and amended petition adding Lafayette as a defendant, the allegations in the petition do not include a claim for attorney's fees as damages; however, a request for attorney's fees is included within the prayer for relief. In answering that petition, Lafayette denied policy coverage for any of plaintiffs' claims and pled its entire policy as an affirmative defense to coverage, but Lafayette did not specifically deny coverage for attorney's fees or plead a policy exclusion for attorney's fees.
After being granted leave to amend their pleadings to add a specific claim for attorney's fees, plaintiffs asserted a claim for the recovery of attorney's fees as damages pursuant to La. R.S. 9:1121.104 within their fourth supplemental and amended petition, filed on July 7, 2015. On August 25, 2015, Lafayette filed an answer to plaintiffs' latest petition and specifically denied that its policy provided coverage for attorney's fees.
Then, on September 16, 2015, Lafayette filed its motion for summary judgment seeking, in part, a finding that the policy does not provide coverage for attorney's fees. Lafayette attached its policy and specifically cited its "SUPPLEMENTARY PAYMENTS-COVERAGES A and B" which provides in pertinent part, as follows:
1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:
e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.
At the hearing on Lafayette's motion for summary judgment, New Jax argued that Lafayette had waived its right to enforce the policy exclusion for attorney's fees because plaintiffs included a request for attorney's fees within their first supplemental and amended petition and Lafayette did not provide timely notice to New Jax that it intended to deny coverage for attorney's fees. In response, Lafayette argued that it had properly reserved its rights to assert coverage defenses and it timely raised the defense of no coverage for attorney's fees in response to plaintiffs' fourth supplemental and amended petition asserting the specific claim for attorney's fees for the first time. Further, Lafayette argued its policy clearly and unambiguously does not provide coverage for attorney's fees taxed against an insured and, therefore, it is not a policy exclusion which must be specifically plead as an affirmative defense.
In ruling upon Lafayette's motion for summary judgment, the trial court found *398 that the policy did not provide coverage for attorney's fees. Although the trial court did not make a specific determination on the issue of waiver, the trial court implicitly found that no waiver occurred.
Based on our review of the record, we find that Lafayette properly and timely reserved its rights to raise coverage defenses; Lafayette pled its entire policy as an affirmative defense within its original answer; the language of the policy clearly states there is no coverage for attorney's fees taxed against the insured; plaintiffs did not assert an allegation and claim for the recovery of attorney's fees until filing their fourth supplemental and amended petition; and Lafayette timely disclaimed coverage for that claim. Based on this record, we find no genuine dispute as to the material facts pertinent to the issue of waiver and we find that Lafayette did not waive its right to disclaim coverage for attorney's fees. Accordingly, we find no error in the trial court's January 15, 2016 judgment granting partial summary judgment in favor of Lafayette finding that the policy does not provide coverage for attorney's fees.
Lafayette's Policy Coverage Defenses to Liability
Lafayette, in its own defense, raises three assignments of error asserting policy coverage defenses to liability for plaintiffs' loss of use damages. First, Lafayette argues that the trial court erred in finding that its policy provided coverage for an active breach occurring in December 2012.[16] Second, Lafayette argues that the trial court erred in finding the policy provided coverage for damages occurring outside the effective dates of the policies, which was from May 9, 2008 through May 9, 2011. Lastly, Lafayette argues that the trial court erred in finding the policy provides coverage for any loss of use damage if this claim is a continuing tort. In response to Lafayette's policy coverage defenses, both New Jax and plaintiffs argue that Lafayette failed to urge these arguments or seek a determination on these issues during the trial court proceedings and, consequently, these arguments are not properly before this Court for the first time on appeal. We agree.
Appellate courts generally find it inappropriate to consider an issue raised for the first time on appeal when that issue was not pled, urged, or addressed in the court below. St. Philip v. Montalbano , 12-1090, p. 8 (La. App. 4 Cir. 1/9/13), 108 So.3d 277, 282, citing Jones v. Department of Police , 11-0571, p. 8 (La. App. 4 Cir. 8/24/11), 72 So.3d 467, 472.
The record reflects that, in its answer to plaintiffs' first amended petition naming Lafayette as a defendant, Lafayette asserted its entire policy as an affirmative defense to liability for plaintiffs' damages and specifically pled the affirmative defense that all or part of the damages alleged by plaintiffs did not occur during the effective dates of the policy. We also note that in its pre-trial order, Lafayette submitted *399 as contested issues of fact whether the policy at issue provides coverage for plaintiffs' claims and whether the claims occurred within the policy period. Thus, Lafayette acknowledged that there were issues of fact to be determined by the fact finder at trial with regard to its policy coverage for plaintiffs' damages.
However, during the four years of litigation, at no time prior to trial did Lafayette seek a determination from the trial court regarding whether the policy provided coverage for plaintiffs' loss of use claim or whether the damages occurred during the effective dates of the policy. Lafayette also did not propose any jury charges or jury interrogatories seeking a determination of facts essential to its policy coverage defenses, i.e., whether the policy covers loss of use damages or whether the damage occurred during the policy period. Moreover, during trial, Lafayette did not present an opening or closing statement to the jury nor did it cross-examine any of plaintiffs' witnesses regarding any policy coverage issues. Then, after the jury returned its verdict in favor of plaintiffs, Lafayette did not object to the final judgment signed by the trial court, which rendered judgment against defendants, in solido , for the entire damages award.[17] Finally, Lafayette did not file a motion for new trial or for remittitur as to its in solido liability for the entire damages award.
Since Lafayette did not argue, seek a ruling from the trial court, or a determination by the jury regarding its policy coverage defenses or its liability for plaintiffs' damages, we will not consider any of the three assignments of error raised by Lafayette asserting policy coverage defenses for the first time on appeal. See Commercial Union Assurance PLC v. Tidewater Marine Service, Inc. , 08-1114, 08-1131, pp. 5-6 (La. App. 4 Cir. 6/24/09), 15 So.3d 1241, 1244 (finding that defendant insurance company failed to raise policy coverage defenses at the liability phase of trial, noting that the trial court found that any defenses asserted after trial were waived and abandoned, and precluding defendant insurance company from asserting policy coverage defenses to liability for the first time on appeal); Steed v. St. Paul's United Methodist Church , 31,521, 31,522, p. 12 (La. App. 2 Cir. 2/24/99), 728 So.2d 931, 941 ("Steed alleged privilege as an affirmative defense, but did not argue it to the jury or request a jury charge on the issue. Since she argues this issue for the first time on appeal, it is deemed abandoned."); see also , Johnson v. State , 02-2382, p. 4 (La. 5/20/03), 851 So.2d 918, 920-21 (finding that the State had not previously argued, at any time in the proceedings below, that plaintiff failed to prove notice of an unreasonably dangerous condition of the premises sufficient to warrant a finding of liability, and the argument would not be considered for the first time on a writ of certiorari).
Plaintiffs' Answer to the Appeal
In their answer to defendants' appeal of the March 24, 2016 judgment, plaintiffs seek reversal of the trial court's March 2, 2016 judgment granting Lafayette's motion in limine to preclude plaintiffs from presenting evidence of a bad faith claim against Lafayette pursuant to La. R.S. 22:1892(A)(4).[18]
*400 When a party files an answer to an appeal, as opposed to a cross appeal, the scope of review is limited to the claims expressly stated in the answer. See La. C.C.P. art. 2133 ; Bd. of Sup'rs of Louisiana State Univ. and Agr. and Mechanical Coll. v. 1732 Canal Street, L.L.C. , 13-0976, p. 32 (La. App. 4 Cir. 1/15/14), 133 So.3d 109, 130. An answer to an appeal operates as an appeal only of those parts of the judgment complained about, and the appellee must state the specific relief demanded. Clark v. Schwegmann Giant Supermarket , 96-2301, p. 5 (La. App. 4 Cir. 1/13/99), 740 So.2d 137, 141.
An appellate court reviews a trial court's rulings on evidentiary matters, such as those raised by a motion in limine, under an abuse of discretion standard of review. Cooper v. Public Belt R. R. , 02-2051, p. 3 (La. App. 4 Cir. 1/22/03), 839 So.2d 181, 183. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or waste of time. La. C.E. art. 403. The party alleging prejudice from the trial court's evidentiary ruling bears the burden of proof. Freeman v. Phillips 66 Co. , 16-0247, p. 5 (La. App. 4 Cir. 12/21/16), 208 So.3d 437, 441-42. On appeal, the reviewing court must determine whether the alleged erroneous evidentiary ruling, when compared to the record in its totality, prejudiced the complaining party and had a substantial effect on the outcome of the case. Id. Ultimately, the appellate court must determine whether the trial court abused its great discretion in ruling on the motion in limine at issue. Bayou Fleet, Inc. v. Bollinger Shipyards, Inc. , 15-0487, 15-0702, p. 12 (La. App. 4 Cir. 7/21/16), 197 So.3d 797, 806.
Additionally, as we find it relevant to our review of appellee's answer, the trial court has great discretion under La. C.C.P. arts. 1151 and 1154 to allow a party to amend his pleadings and in determining whether to admit or disallow evidence subject to an objection based upon the scope of the issues and pleadings. Denton v. Vidrine , 06-0141, 06-0142, p. 13 (La. App. 1 Cir. 12/28/06), 951 So.2d 274, 285.
In their answer to the appeal, plaintiffs argue that the trial court abused its discretion in granting Lafayette's motion in limine, which precluded plaintiffs from presenting evidence of a bad faith claim against Lafayette because plaintiffs' third amended and supplemental petition sufficiently pled and gave notice to Lafayette of plaintiffs' bad faith claim in accordance with La. R.S. 22:1892.
Our review of the entire record reflects that the trial court addressed this issue of the plaintiffs' bad faith claim against Lafayette several times prior to trial. Therefore, we review the procedural history on this issue.
Plaintiffs first named Lafayette as a joint defendant with New Jax in their first supplemental and amended petition filed on March 11, 2013.[19] On March 27, 2014, *401 plaintiffs filed a motion for leave to file third supplemental and amended petition to assert, for the first time, a claim against Lafayette pursuant to La. R.S. 22:1892. In the third amended petition, plaintiffs alleged as follows:
XV.
Plaintiffs presented to defendants, in particular, defendant Lafayette Insurance Company, on November 6, 2013, a proposal for repairs to the interior of Unit 5-C. This proposal was prepared by Albert Construction Company.
XVI.
Defendants Lafayette Insurance Company and New Jax submitted to plaintiffs on January 9, 2014, a proposal for repairs to the interior of Unit 5-C. This proposal was prepared by C & G Construction of LA. The amount set forth in the proposal for interior repairs was $91,032.08. The proposal was dated December 4, 2013.
XVII.
Despite demand, Lafayette has not paid to plaintiffs the amount due for the interior damage repair.
XVIII.
Plaintiffs are additional insureds on the Lafayette policy insuring the Association.
XIX.
Lafayette owes plaintiffs a duty to act in good faith by paying the undisputed portion of the interior damage repairs set forth in the C & G Construction proposal.
XX.
Lafayette Insurance Company's refusal to pay plaintiffs for the interior damage in excess of 60 days of having sufficient evidence supporting the payment is arbitrary, capricious, or without probable cause and subjects Lafayette Insurance Company to a bad faith claim and resulting damages to plaintiffs.
XXI.
As a result of its actions, defendant Lafayette Insurance Company is liable to plaintiffs for its bad faith pursuant to La. R.S. 22:1892 and La. R.S. 22:1973.[20]
On April 28, 2014, Lafayette filed an opposition to plaintiffs' motion for leave to file the third supplemental and amended petition, arguing, in part, that the addition of a bad faith claim prejudiced it due to the impending trial date of September 15, 2014. Despite Lafayette's opposition, the trial court signed an order on June 11, 2014, granting plaintiffs' motion for leave to file the third supplemental and amended petition.[21]
On September 11, 2014, four days prior to the original trial setting, Lafayette filed a pre-trial memorandum setting forth, in pertinent part, that plaintiffs' only bad faith claim against Lafayette alleged a failure to tender payment for property damage in the amount set forth in the C & G Construction estimate for repairs. Lafayette submitted that plaintiffs never pled a separate bad faith claim for failure to make a written offer to settle the property *402 damage claim within thirty days of satisfactory proof of loss, pursuant to La. R.S. 22:1892(A)(4) ; thus, Lafayette submitted that plaintiffs could not assert the latter bad faith claim at trial. In response, on September 14, 2015, plaintiffs filed a motion to amend the pleadings to conform to evidence. Plaintiffs submitted that their third supplemental and amended petition set forth sufficient allegations to give notice and fairly inform Lafayette of the claims asserted pursuant to La. R.S. 22:1892.
On May 22, 2015, following a hearing on plaintiffs' motion to amend the pleadings, the trial court specifically denied plaintiffs' motion insofar as it sought to amend the bad faith claim to plead a claim under subsections (A)(4) and (B)(1) of La. R.S. 22:1892. Plaintiffs then sought review from this Court, which denied plaintiffs' writ. FIE, LLC v. New Jax Condominium Ass'n and Earl Weber, Jr. , unpub. , 15-0670 (La. App. 4 Cir. 8/5/15).[22]
Then, on January 27, 2016, Lafayette filed a motion in limine to exclude evidence of claims not before the court, stating that it still anticipated an attempt by plaintiffs to offer evidence at trial of a bad faith claim under La. R.S. 22:1892(A)(4) despite the trial court's previous judgment denying plaintiffs' motion to amend the pleadings. On February 19, 2016, the trial court heard arguments on Lafayette's motion and took the matter under advisement to review the record and previous rulings on this issue of the bad faith claim. On March 2, 2016, the trial court rendered judgment granting Lafayette's motion in limine and issued reasons for judgment. In its reasons for judgment, the trial court reviewed the record of the proceedings and found that plaintiffs' motion to amend the pleadings, filed on the eve of the original trial date, "sought to add a new [bad faith] claim for failure to submit a settlement demand within thirty (30) days of satisfactory proof of loss." Although the original trial date was continued, the trial court had precluded any new claims from being asserted at that stage of the proceedings and denied plaintiffs' motion to amend the pleadings. Based on its previous ruling that the plaintiffs could not add the additional bad faith claim, the trial court concluded that any evidence of such a claim would be specifically excluded at trial.
In this answer to the appeal, plaintiffs do not seek review or relief from the trial court's May 22, 2015 judgment denying their motion to amend the pleadings to assert a bad faith claim under La. R.S. 22:1892(A)(4) ; rather, plaintiffs assert that the trial court misinterpreted that judgment as "tantamount to a ruling that no claim pursuant to La. R.S. 22:1892A.(4) had been pled." (a "Section 1892(A)(4) claim") Plaintiffs maintain that a Section 22:1892 claim was sufficiently pled within their third supplemental and amended petition and, consequently, the trial court's judgment denying plaintiffs' motion to amend the pleadings did not affect plaintiffs' right to present evidence of a Section 1892(A)(4) claim at trial. Thus, plaintiffs contend that the trial court's judgment denying plaintiffs' motion to amend the pleadings is irrelevant to the determination of whether the trial court abused its *403 discretion in granting Lafayette's motion in limine to exclude evidence of claims not before the court. We disagree. Given the trial court's familiarity with this case and its great discretion in these rulings, we find no abuse of discretion by the trial court in its application of its prior ruling and, thus, no abuse of discretion in the trial court's March 2, 2016 judgment granting Lafayette's motion in limine to exclude evidence of a Section 1892(A)(4) claim.
Plaintiffs also argue that the trial court erred in failing to construe the pleadings liberally to find that plaintiffs' third and supplemental petition sufficiently put Lafayette on notice of a bad faith claim pursuant to La. R.S. 22:1892(A)(4). However, statutory penalties, such as those provided within La. R.S. 22:1892, are considered items of special damage, which must be specifically alleged. Dennis v. Allstate Ins. Co. , 94-305, p. 6 (La. App. 5 Cir. 10/25/94), 645 So.2d 763, 766 ; Arnone v. Anzalone , 481 So.2d 1047, 1050 (La. App. 1st Cir. 1985) ; see La. C.C.P. art. 861. While the allegations in the petition need not cite the precise section of the statute under which relief is sought, the facts alleged must establish the necessary elements of the claim asserted under the statute. See Arnone , supra ; Mix v. Mougeot , 446 So.2d 1352, 1356 (La. App. 1st Cir. 1984).
Upon review of the pleadings, we note that plaintiffs' third supplemental and amended petition does not specifically allege that Lafayette failed to make a written offer to settle the interior property damage claim within thirty days of receiving satisfactory proof of loss, pursuant to La. R.S. 22:1892(A)(4). Therefore, in consideration of the pleadings, the applicable law, and the trial court's prior relevant judgment, we do not find that the trial court abused its discretion in granting Lafayette's motion in limine to exclude evidence of a bad faith claim pursuant to La. R.S. 22:1892(A)(4).
We find no merit to the arguments raised in plaintiffs' answer to the appeal, and we affirm the trial court's judgment on Lafayette's motion in limine.
Defendants' Appeal of January 6, 2017 Judgment
We now turn to defendants' appeal of the trial court's January 6, 2017 judgment granting, in part, plaintiffs' motion to tax costs and ordering defendants to pay a total of $49,862.92 for court costs and specified expert fees.
While the appeal of the March 24, 2016 judgment was pending in this Court, plaintiffs filed a motion to tax costs in the trial court, seeking all of the costs of the trial to be assessed against New Jax. Plaintiffs submitted invoices to recover costs for filing fees, service of process, deposition costs, expert fees, and other costs associated with trial. In total, plaintiffs sought to recover $121,930.40 in costs and expert fees.
Before the hearing on plaintiffs' motion, on December 15, 2016, the parties came to agreement on the amounts to be assessed as expert fees attributable to Greg Fisher ($3,500), Cal Grevemberg ($5,510), and Samara Poche ($2,300). At the hearing, three cost items remained in dispute. Plaintiffs sought expert fees associated with Harold Asher's financial reports and trial testimony in the amount of $46,840; they submitted invoices for consultation work with the Dancel Multimedia Group ("Dancel") in the amount of $30,680.52; and they sought to be granted $17,105.84 in other court costs.[23]
*404 At the hearing, the trial court heard testimony from Mr. Asher regarding the scope and complexity of the work he performed reviewing New Jax's financial records on behalf of plaintiffs and the expenses he incurred in connection with that work and trial preparation. The trial court also heard arguments from both parties regarding the equitable assessment of costs in this case.
In ruling on plaintiffs' motion to tax costs, the trial court noted its reliance on La. C.C.P. art. 1920 and stated its finding that both parties prevailed at trial, making both parties susceptible to the payment of costs. Then, based on the invoices presented, Mr. Asher's testimony, the parties' arguments, and in light of applicable jurisprudence, the trial court assessed and awarded costs to plaintiffs as follows: $20,000 in association with Mr. Asher's testimony; $10,000 for the Dancel costs; and fifty percent of the $17,105.84 in court costs ($8,552.92).
On January 6, 2017, the trial court entered judgment as follows:
The motion to tax costs filed by Plaintiffs is GRANTED in Part;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendants, New Jax Condominiums Association, Inc., and Lafayette Insurance Company, shall be cast with the following costs and expert fees:
Court costs $8,552.92 Expert fees attributable to Cal Grevemberg $5,510.00 Expert fees attributable to Greg Fischer $3,500.00 Expert fees attributable to Sam Poche $2,300.00 Expert fees attributable to Harold Asher $20,000.00 Fees attributable to Dancel Multimedia $10,000.00 TOTAL $49,862.92
In all other respects, plaintiffs' motion to tax costs is denied.
In this appeal, defendants argue that since both parties prevailed at trial, the trial court should have ordered each party to bear its own costs or, in the alternative, should have determined a reasonable amount of costs and split those costs evenly between the parties.
A trial court has great discretion in awarding costs, including expert witness fees; and the trial court's assessment will not be reversed on appeal absent an abuse of discretion. Bayou Fleet , 15-0487, 15-0702, p. 20, 197 So.3d at 810 ; Watters v. Dep't of Soc. Services , 08-0977, p. 49 (La. App. 4 Cir. 6/17/09), 15 So.3d 1128, 1162.
The procedure for taxing costs is governed by La. C.C.P. art. 1920, which provides as follows:
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
Taxable court costs are statutorily defined as "the costs of the clerk, sheriff, witness' fees, costs of taking depositions and copies of acts used on the trial and all other costs allowed by the court." La. R.S. 13:4533.
*405 Recoverable costs include expert witness fees for testifying at trial and the time spent preparing for that testimony. Bayou Fleet , 15-0487, 15-0702, p. 21, 197 So.3d at 811. Pursuant to La. R.S. 13:3666, the trial court shall fix the amount of expert witness fees to be taxed as costs against the party cast in judgment based upon the value of time employed and the degree of learning or skill required. The determination of the reasonableness of an expert fee award depends upon the particular facts and circumstances of the case. Id. , 15-0487, 15-0702,p. 22, 197 So.3d at 811. Factors to be considered by the trial court include the time spent testifying; time spent in preparing for trial; the extent and nature of the work performed; the knowledge, attainments and skill of the expert; the helpfulness of the expert's report and testimony to the trial court; and the complexity of the problem addressed by the expert. See id. ; McDougald v. St. Francis North Hosp., Inc. , 50,079, p. 5 (La. App. 2 Cir. 10/14/15), 179 So.3d 715, 718.
Based on our review of the record, we agree with the trial court that both parties prevailed on their own claims at trial, and, in light of the governing provision of La. C.C.P. art. 1920, we find no abuse of discretion in the trial court's finding that both parties were susceptible to pay costs associated with the trial. Further, upon review of the reasons provided by the trial court in its assessment of costs and expert fees, in light of the applicable jurisprudence, we find no abuse of discretion in the trial court's assessment of costs and expert fees. Accordingly, we affirm the trial court's January 6, 2017 judgment granting, in part, plaintiffs' motion to tax costs and casting defendants for costs and fees in the amount of $49,862.92.
CONCLUSION
For the foregoing reasons, we find no merit in the arguments raised by defendants in their appeal of the trial court's March 24, 2016 final judgment or in the arguments raised by plaintiffs in their answer to the appeal. Accordingly, we affirm the March 24, 2016 judgment in all respects. In addition, finding no abuse of discretion in the trial court's assessment of costs and expert fees, we affirm the trial court's January 6, 2017 judgment.
AFFIRMED

At trial, plaintiffs and defendants introduced numerous emails, dated from July 14, 2009, to October 5, 2011, between Mr. Jordan and representatives for New Jax as joint exhibits.

At the time suit was filed, FIE was the sole plaintiff; and Iberia Tigers was added as a plaintiff by the Second Supplemental and Amended Petition on October 15, 2013. However, for ease of reference and discussion, we employ the collective term "plaintiffs" from the time suit was filed.

The original petition also named Earl Weber, Jr. as a defendant, jointly liable with New Jax for all damages as a result of his negligent acts as President of the Board of New Jax. Prior to trial, on September 16, 2015, the trial court granted summary judgment in favor of Earl Weber, Jr., and dismissed all claims against him.

Paragraph XII of plaintiffs' first and second supplemental and amended petitions alleged the following damages: damage to the interior structures of the unit due to water saturation and resulting rot; water damage to movable property located inside the unit; deprivation of the liberty of enjoying the unit; diminution of value in the unit due to constant water ingress issue which [New Jax] failed to correct; loss of income as a result of the constant water ingress; liability for mortgage payments, utility bills, insurance premiums, real estate taxes and assessments by [New Jax]; loss of use; current uninsured exposure due to inability to obtain hazard insurance; damages incurred for measures taken to mitigate damages, retention of consultants, alternative living expenses, travel expenses, insurance; and other damages to be introduced and proven at trial.

Defendants first raised this issue by a motion for partial summary judgment, filed on December 9, 2013, seeking to dismiss all of plaintiffs' claims seeking recovery for non-pecuniary damages, specifically including, but not limited to, "loss of use" and "deprivation of the liberty of enjoying the unit." In response, on January 14, 2014, plaintiffs filed an unopposed motion to withdraw their "claims for emotional, non-pecuniary damages," which the trial court granted the same day. Subsequently, on January 30, 2014, plaintiffs filed an opposition to New Jax's motion for partial summary judgment arguing it was moot and should be dismissed in consideration of the trial court's order granting the withdrawal of claims. We note that neither plaintiffs' motion nor the trial court's order specify which claims asserted by plaintiffs belonged to the class of "emotional, non-pecuniary damages" that were withdrawn.

This Court denied plaintiffs' writ seeking review of the trial court's August 5, 2014 judgment denying plaintiffs' motion for partial summary judgment on their right to claim loss of use and the proper measure of damages. FIE, LLC v. New Jax Condo. Ass'n , unpub. , 14-0879 (La. App. 4 Cir. 8/25/14).

Defendants' sought supervisory review of the trial court's July 1, 2015 judgment granting plaintiffs' motion for partial summary judgment and denying defendants' motion for partial summary judgment on the issue of loss of use damages. This Court denied defendants' writ. FIE, LLC v. New Jax Condo. Ass'n , unpub. , 15-0813 (La. App. 4 Cir. 9/21/15).

Amended and reenacted as La. C.C.P. art. 966(A)(3), by Acts 2015, No. 422, § 1, eff. Jan. 1, 2016.

Amended and reenacted as La. C.C.P. art. 966(D)(1), by Acts 2015, No. 422, § 1, eff. Jan. 1, 2016.

In Whitehead , plaintiffs-the owner of the vehicle and her insurance company-filed suit against defendant alleging tortious conversion of a vehicle brought to defendant for repairs after an automobile accident. The trial court's judgment included a general damages award in favor of plaintiffs for the loss of enjoyment and use of the vehicle, mental anguish, and inconvenience. Upon review of the case, the First Circuit noted that prior to filing suit plaintiff's insurance company, State Farm, had declared the vehicle a total loss, paid plaintiff the total estimated value of the vehicle, and obtained title to the vehicle from plaintiff. In reversing the trial court's award of general damages, the First Circuit reasoned that, "[Ms. Whitehead] did not suffer any loss of enjoyment, use of the vehicle, mental anguish or inconvenience because she was reimbursed for the full value of the car" and "State Farm, a corporation, is incapable of experiencing loss of enjoyment, mental anguish, and inconvenience." Whitehead , 02-0027, p. 6 (La. App. 1 Cir. 12/20/02), 837 So.2d at 682, citing City of New Orleans v. Grand Lodge of Independent Order of Odd Fellows , 241 So.2d 7, 10 (La. App. 4th Cir. 1970).

"One injured through the fault of another is entitled to full indemnification for damages caused thereby." State Farm Mut. Auto Ins. Co. v. Berthelot , 98-1011, p. 7 (La. 4/13/99), 732 So.2d 1230, 1234. "The term 'damages' refers to 'pecuniary compensation, recompense, or satisfaction for an injury sustained.' " Wainwright v. Fontenot , 00-0492, p. 5 (La. 10/17/00), 774 So.2d 70, 74, quoting Fogle v. Feazel , 201 La. 899, 910, 10 So.2d 695, 698 (1942). Compensatory damages are the most common type of damages in the delictual context. Id.

We find no merit in defendants' argument that the trial court erred by reversing a "validly-granted" motion for directed verdict sua sponte without receiving additional evidence. The record reflects that after hearing arguments on defendants' motion for directed verdict, the trial court initially stated that plaintiffs' case sounded in contract rather than tort and that the motion for directed verdict was granted. However, the trial court denied the dismissal of plaintiffs' claim for loss of use. Finding this ruling inconsistent, the parties sought clarification on the trial court's ruling. The trial court then invited the parties to submit briefs on the issue of whether plaintiffs' claim sounded in contract and in tort; the court informed the parties that it would take the matter under advisement and clarify its ruling on the motion for directed verdict after further review. The following trial day, the trial court acknowledged that it had not made a clear ruling on the motion for directed verdict, and, after review of the case and applicable law, the trial court denied the motion for directed verdict, having found sufficient evidence presented to support both a breach of contract and a tort claim. Upon our review of the record, we note that the trial court acknowledged that it should not have stated that the motion was granted before taking the matter under advisement and, subsequently, denying their motion. However, in consideration of the legal standard to be applied by the trial court in ruling upon a motion for directed verdict, we find no error in the trial court's decision to further review the law and evidence relevant to defendants' motion for directed verdict prior to issuing a final, "clarified" ruling on the motion. See Wichser v. Trosclair , 99-1929, 99-1930, p. 5 (La. App. 4 Cir. 2/28/01), 789 So.2d 24, 27 ("[I]t would not be error for a trial court to deny a directed verdict where reasonable men might disagree with the trial court decision to deny the motion for directed verdict, but it would be error to grant the motion where reasonable men might disagree with the decision to grant it.")

The parties stipulated at trial that New Jax was responsible for the maintenance, repair, and replacement of the common elements of the property, including the roof, pursuant to its obligations under the Condominium Association Declaration and By-Laws.

La C.C.P. art. 1972 provides, in pertinent part, that "[a] new trial shall be granted, upon contradictory motion of any party... (1) [w]hen the verdict or judgment appears clearly contrary to the law and the evidence."

Although defendants objected to Mrs. Poche being accepted as an expert witness in residential real estate leasing, defendants do not assign error to the trial court's ruling accepting her as an expert witness.

Lafayette contends that the trial court made a finding that an "active breach" occurred in December 2012. From a review of the record and briefs, it appears Lafayette is referring to the trial court's reasons for denying defendants' motion for new trial based on the general tort duty owed by defendants. In finding that defendants' owed a general tort duty, the trial court noted that the roof repairs, particularly when the roof was removed and replaced, posed risks to the general public, and stated, "that's illustrative of the kind of problems that could have arisen throughout the course of this from a general tort liability aspect." The trial court did not make a specific finding that a particular act or occurrence constituted the active breach of contract; rather, in this continuing tort case, the active, negligent conduct of New Jax constitutes the active breach of contract that sounds in tort. See Dubin , 25,996, pp. 5-6, 641 So.2d at 1040.

The Rule 9.5 Certificate filed with the proposed judgment reflects that plaintiffs' counsel prepared and circulated the proposed final judgment to all parties and only one objection was raised by New Jax regarding the running of interest in favor of plaintiffs commencing on the date of judicial demand.

Plaintiffs filed a timely answer to the defendants' appeal on September 2, 2016. Plaintiffs, neither collectively nor individually, filed a notice of appeal or a cross-appeal of a final judgment in this record. However, on December 13, 2016, plaintiff, Iberia Tigers, LLC, filed an "Original Brief On Behalf of Appellant/Plaintiff Iberia Tigers, LLC." The jurisdictional statement erroneously states "[t]his appeal was initiated pursuant to La. C.C.P. art. 2133, by way of Answer to the Appeal filed by New Jax Condominium Association, Inc. and Lafayette Insurance Company" and "[t]his is an appeal from the final appealable judgment dated May 23, 2016." The trial court's May 23, 2016 judgment denied New Jax's motion for new trial and motion for remittitur.

The Second Amended Petition, filed on October 13, 2013, did not assert any additional claims against defendants, but added Iberia Tigers, as a plaintiff, based on the transfer of ownership of Unit 5-C from FIE to Iberia Tigers on November 13, 2012.

On June 31, 2014, plaintiffs filed an unopposed motion to withdraw the claim pursuant to La. R.S. 22:1973.

The record reflects that plaintiffs filed a reply to Lafayette's opposition on May 2, 2014. The trial court's June 11, 2014 order includes several rulings on the "[v]arious motions" that came for hearing on May 9, 2014; however, the excerpt of the May 9, 2014 proceedings made part of this record does not include the arguments regarding plaintiffs' motion for leave to file the third supplemental and amended petition.

It is well-settled that the denial of a writ by an appellate court has no precedential value and does not bar reconsideration or a different conclusion on the same issue on a subsequent appeal. Armstrong Airport Concessions v. K-Squared Restaurant, LLC , 15-0375, p. 8 (La. App. 4 Cir. 10/28/15), 178 So.3d 1094, 1100. We note, however, that this Court found "no abuse of discretion in the trial court's judgment of May 22, 2015, which prohibited the [plaintiffs] from amending their petition to state a claim against respondent under La. R.S. 22:1892(A)(4) and (B)(1)." FIE , supra .

The parties agreed that $17,105.84 was the amount due for court costs, but they disputed how those costs should be assessed.