| KENT JENSEN AND SAEKO YATSUKA JENSEN, (HUSBAND AND WIFE), FOR THEIR OWN, AND AS PARENTS AND LEGAL GUARDIANS ON BEHALF OF THEIR MINOR CHILDREN | * | NO. 2019-CA-0706 |
| --- | --- | --- |
| | * | |
| | | COURT OF APPEAL |
| | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |
| VERSUS | * * * * * * * | |
| ALLAN M. MATUTE, ALMA MILADIS ANTUNEZ MENOCAL, GEICO GENERAL INSURANCE COMPANY, AND IMPERIAL FIRE & CASUALTY INSURANCE COMPANY | | |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2016-01476, DIVISION "G-11"
Honorable Robin M. Giarrusso, Judge
* * * * * *
**Judge Rosemary Ledet**
* * * * * *

(Court composed of Judge Edwin A. Lombard, Judge Rosemary Ledet, Judge Sandra Cabrina Jenkins)
**JENKINS, J., CONCURS IN THE RESULT**

Robert C. Evans
Kristin M. Lausten
EVANS & COMPANY
629 Cherokee Street
New Orleans, LA 70118

      COUNSEL FOR PLAINTIFF/APPELLANT


Paul D. Oberle, Jr.
RICHIE RICHIE & OBERLE, L.L.P.
1800 Creswell Avenue
Shreveport, LA 71134

      COUNSEL FOR DEFENDANT/APPELLEE

            **AFFIRMED**
           **JANUARY 29, 2020**

This is a tort suit arising out of a rear-end collision. The narrow issue presented is quantum—the amount of compensatory (special or general) damages, if any, the plaintiff, Dr. Kent Jensen, is entitled to recover as a result of the loss of use of his nineteenth-century Granjon violoncello (the "Granjon Cello") for the 111-day period it took to repair the cello. Following a bench trial, the trial court dismissed Dr. Jensen's loss of use claim. For the reasons that follow, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Dr. Jensen is a professional cellist and a member of the Louisiana Philharmonic Orchestra. He started playing the cello when he was ten-years old and obtained a doctoral degree in musical arts and cello performance. In 1985, while he was earning his master degree, Dr. Jensen purchased an unbranded, nineteenth-century French cello, which he characterized as a student instrument (the "Student Cello"). He paid $6,500 for the Student Cello. For approximately thirty years, Dr. Jensen played the Student Cello—twenty years of which was during his tenure with the Louisiana Philharmonic Orchestra.

In December 2014, Dr. Jensen purchased the Granjon Cello from a friend, William Schultz. Although the Granjon Cello's appraised value was $65,000, Mr. Schultz sold it to Dr. Jensen for $47,500.[1] Six months after purchasing the Granjon Cello (in June 2015), the car that Dr. Jensen was driving was rear-ended by a car driven by Allan Matute, owned by Alma Menocal, and insured by Imperial Fire and Casualty, Inc. ("Imperial").[2] At the time of the rear-end collision, the Granjon Cello was in the back of Dr. Jensen's vehicle. Although the cello sustained no visible signs of damage, Dr. Jensen noticed the next day that the cello did not sound right when he played it. Dr. Jensen sensed a "rattle." He also noticed that the cello made a "buzz" when he played it more aggressively.

To determine if the Granjon Cello was damaged, Dr. Jensen took it to Keller Strings, a violin shop in New Orleans. According to Dr. Jensen, Keller Strings determined that the cello might have some sort of crack. Although Keller Strings repairs cellos, Dr. Jensen opted to have a luthier with more expertise examine and repair the Granjon Cello. Dr. Jensen selected Robertson & Sons in Albuquerque, New Mexico, to do the repair work for two reasons. First, Mr. Schultz, the cello's prior owner, had used Robertson & Sons to do repair work on the Granjon Cello. Second, Dr. Jensen's attorney recommended Robertson & Sons.

On July 13, 2015, the Granjon Cello was shipped to Robertson & Sons. While the cello was being repaired, Dr. Jensen reverted to using the Student Cello. On October 16, 2015, the Granjon Cello was returned to Dr. Jenson. The Granjon Cello neither sustained permanent damage nor suffered a diminution in value.

---

[1] At the time of the trial, Dr. Jensen was still paying Mr. Schultz for the Granjon Cello.

[2] Given the stipulation to liability for the rear-end collision, the details of the collision are not relevant.

Seeking to recover the damages sustained in the accident, including damages for loss of use of the Granjon Cello during the period that it was being repaired, Dr. Jensen[3] filed this suit against Mr. Matute, Ms. Menocal, and Imperial (collectively the "Defendants").[4] Before trial, Dr. Jensen settled all of his claims against the Defendants with one exception—his loss of use claim.

In April 2019, a one-day bench trial was held on the loss of use claim. At the beginning of the trial, the parties stipulated to the following:

- Dr. Jensen was without the use of his properly functioning Granjon Cello for 111 days—the period from the date of the rear-end collision, June 27, 2015, through the return of the repaired Granjon Cello on October 16, 2015;

- Mr. Matute was solely at fault in causing the rear-end collision;

- Imperial had a policy in effect on the date of the collision that provided coverage for the loss of the cello subject to the limits in the policy, which included a $25,000 property damage limit;

- The property damage limit of the Imperial policy was reduced by $3,272.05 by prior payments to Dr. Jensen—$878.10 for the repair of the vehicle; $1,500 for the repair of the cello; and the cost of shipping the cello to Robertson & Sons—leaving a remaining limit of $21,727.95;

- Dr. Jensen agreed there would be no judgment against the individual defendants, Mr. Matute and Ms. Menocal; and

- Dr. Jensen owned the Granjon Cello at the time the accident occurred.[5]

---

[3] Although Dr. Jensen's wife and minor children were also joined as plaintiffs, we refer to the Dr. Jensen singularly as the plaintiff for ease of discussion.

[4] Dr. Jensen also joined as a defendant his uninsured/underinsured motorist carrier, GEICO General Insurance Company ("GEICO"). Dr. Jensen, however, voluntarily dismissed his claims against GEICO before trial.

[5] Mr. Schultz, the prior owner of the Granjon Cello, attested in his affidavit that was introduced at trial, that before December 2014 he owned the cello. In December 2014, he agreed to sell the cello to Dr. Jensen, who took possession of the instrument at that time. Under the sale agreement between them, Dr. Jensen was continuing to make payments for it to Mr. Schultz. Nonetheless, Mr. Schultz attested that Dr. Jensen was the sole person entitled to claim loss or damage to the instrument occurring after December 2014. Finally, Mr. Schultz assigned to Dr. Jensen any retained right to the Granjon Cello.

The testimony and evidence introduced at trial established the following. During the 111-day repair period, Dr. Jensen neither inquired about renting nor rented a replacement instrument for three reasons. First, he believed it would only take Robertson & Sons a week or two to repair his cello. Second, he knew he could not find a similar instrument locally and that he would have to travel to New York to find a comparable instrument. Finally, he was able to practice and perform professionally using the Student Cello. Indeed, he had only purchased the Granjon Cello six months before the rear-end collision; whereas, he had used the Student Cello to perform professionally for thirty years. Dr. Jensen did not lose any jobs as a professional cellist during the repair period. Dr. Jensen acknowledged that the Granjon Cello worked as well after the repairs as before the accident.

In an attempt to establish the Student Cello was not an adequate substitute, Dr. Jensen called as an expert witness his colleague, Jordan Gerhardt.[6] Mr. Gerhardt —who was qualified as an expert cellist—opined that the Granjon Cello and the Student Cello were not equivalent instruments. Mr. Gerhardt described the Student Cello as "thin and unsubstantial." He explained that the principal difference between the instruments was the sound quality. He opined that the Student Cello was an inadequate substitute for the Granjon Cello because it lacked the quality and depth of sound to produce satisfying musical expression. Nonetheless, he acknowledged that Dr. Jensen had used the Student Cello for over twenty years in the Louisiana Philharmonic Orchestra without complaint.

To establish the rental value of the Granjon Cello, Dr. Jensen called Ms. Keller Smith, the co-owner of Keller Strings, as an expert witness. Ms. Smith was

---

[6] Both Dr. Jensen and Mr. Gerhardt started work at the Louisiana Philharmonic in 1994. At the time of trial, Mr. Gerhardt was a section leader; Dr. Jensen was a section cellist.

qualified as an expert in the sale and rental of stringed musical instruments and the market rates for such rentals. Ms. Smith testified that in order to rent a rare and delicate instrument, like the Granjon Cello, the rental price would be twenty-five percent of the value of the instrument per month. Given the Granjon's appraised value was $65,000, she calculated that the rental would be $16,250 per month ($541.67 per day). Ms. Smith agreed with the trial court's suggestion that if one were to rent the instrument for 120 days, the rental value would be the full value of the cello. Ms. Smith confirmed that Keller Strings did not have a cello of the same caliber as the Granjon Cello available to rent or to sell. She also confirmed that Dr. Jensen never inquired about renting a cello.

Following the bench trial, the trial court ruled in the Defendants' favor and dismissed Dr. Jensen's loss of use claim. In its written reasons for judgment, the trial court observed:

> Dr. Jensen testified that he suffered no economic loss as a result of the accident for which he has not been compensated. The defendant insurance company paid for the repair of his car, the cost of shipping the cello to New Mexico and the cost of repairing the cello. The Court can't help but wonder if the time for repair would have been shortened had Dr. Jensen let his local expert Paula Keller repair the cello. Dr. Jensen testified that he lost no jobs as a professional cellist during the repair period. . . . Once repaired, the cello had no permanent damage nor reduction in value.

> Plaintiff's expert, Paula Keller, testified that . . . [i]f one was to rent a vintage instrument for four months, one would pay in rental the full value of the instrument. Interestingly, plaintiff claimed the cost of $65,000 although he ultimately paid only $47,500 for the Granjon. Plaintiff is arguing that he is entitled to recover a rental cost that he did not incur. Plaintiff did not nor did he need to rent a substitute cello as he had the same instrument he had used professionally for thirty years.

> Much was made of the relative differences between the two cellos. It was suggested that the Granjon was a superior cello to the instrument Dr. Jensen had played for thirty years. The suggestion that his original cello was an inadequate substitute was belied by the facts.

Dr. Jensen used that cello to become what he is today—a respected professional cellist. No one at the symphony ever complained about the inferiority or inadequacy of the original cello.

The goal of tort recovery is to make the victim whole. Dr. Jensen has neither rental expenses nor did he suffer considerable inconvenience or mental anguish for the time his cello was being repaired. Accordingly, his claim for loss of use is denied.

This appeal followed.

## DISCUSSION

As noted at the outset, the issue here is quantum—the compensatory damages, if any, that Dr. Jensen is entitled to recover as a result of the loss of use of the Granjon Cello. Compensatory damages are designed to place an injured party in the position he or she would have been in had the tortious conduct not occurred. *Wainwright v. Fontenot*, 00-0492, p. 5 (La. 10/17/00), 774 So.2d 70, 74. Compensatory damages are "divided into the broad categories of special damages and general damages." *Id.; see also McGee v. A C and S, Inc.,* 05-1036, p. 3 (La. 7/10/06), 933 So.2d 770, 774. General damages are defined as "those which may not be fixed with pecuniary exactitude." *Duncan v. Kansas City Southern Railway Co.*, 00-0066, p. 13 (La. 10/30/00), 773 So.2d 670, 682. In contrast, special damages are those having a "ready market value" such that the amount theoretically may be determined with relative certainty. *McGee*, *supra*.

Loss of intellectual or emotional enjoyment fall into the category of general damages because they are inherently speculative and lack a measurable pecuniary value. *FIE, LLC v. New Jax Condo Ass'n, Inc.*, 16-0843, 17-0423, p. 14 (La. App. 4 Cir. 2/21/18), 241 So.3d 372, 387, *writs denied*, 18-449, 18-446 (La. 5/25/18), 243 So.3d 544, 545.[7] In contrast, "loss of use of property falls within the category

---

[7] "When property can be adequately repaired, the measure of damages is the cost of restoration, plus the loss of use during the time reasonably necessary for the repairs." *Nunez v. St. Bernard*

of special damages because it can be measured fairly and to a degree of relative certainty by the rental value of substitute property." *Id.*

Loss of use damages are recoverable irrespective of the character of the use—business, family, or personal. *Nolan v. Liuzza*, 301 So.2d 892, 894 (La. App. 4th Cir. 1974). "The normal measure of damages for loss of use is the rental value of similar property and perhaps necessary incidental expenses." *Chriss v. Manchester Insurance & Indemnity Co.,* 308 So.2d 803, 806 (La. App. 4th Cir. 1975). A plaintiff does not have to rent a substitute to recover loss of use damages. *Id.* "Rental (which accomplishes the substitution of the use of similar property for that of the injured property) does not determine entitlement to damages, but only provides a fair measure of damages in appropriate cases." *Id.*

A different standard of review applies to special and general damage claims. An appellate court reviews a trial court's conclusion regarding a special damage claim by applying the manifest error standard of review. *Kaiser v. Hardin*, 06-2092, pp. 11-12 (La. 4/11/07), 953 So.2d 802, 810; *Kaltenbaugh v. Bd. of Supervisors*, 18-1085, 18-1086, p. 19 (La. App. 4 Cir. 10/23/19), 282 So.3d 1133, 1146. An appellate court reviews a trial court's conclusion regarding a general damage claim pursuant to an abuse of discretion standard. *Wainwright*, 00-0492, p. 6, 774 So.2d at 74.

With these principles in mind, we turn to an analysis of Dr. Jensen's special and general damage claims. We separately address each claim.

*Special Damages*

---

*Par. Fire Dep't*, 519 So.2d 857, 862 (La. App. 4th Cir. 1988). "The period of compensatory loss of use is the time required to secure the repair of the property in the exercise of proper diligence." *Enriquez v. Safeway Ins. Co. of Louisiana*, 52,425, pp. 5-6 (La. App. 2 Cir. 1/16/19), 264 So.3d 648, 652.

Dr. Jensen contends that the trial court erred in denying his loss of use claim for special damages in the amount of $60,125.37, consisting of the daily rental rate of $541.67 multiplied by the 111 days he was without use of the Granjon Cello. Defendants counter that Dr. Jensen's rental value claim is essentially a claim for the full appraised value of the cello, $65,000, which would amount to a "windfall." Defendants point out that it would be absurd to rent an instrument for that price, particularly when Dr. Jensen had the unfettered use of the same instrument he had used professionally for thirty years, the Student Cello, and thus sustained no actual damages. Defendants also emphasize that Dr. Jensen limited his request for special damages to the rental value.

As the party asserting a special damage claim, Dr. Jensen had the burden of proving such claim by a preponderance of the evidence. *Jordan v. Travelers Ins. Co.*, 257 La. 995, 1007-08, 245 So.2d 151, 155 (1971) (observing that a tort victim has the burden of proving by a preponderance of the evidence the damages caused by the defendant's fault); *Nelson v. Hawkins*, 244 So.2d 656, 658 (La. App. 2d Cir. 1971) (observing that the amount of loss of use damages "must be proved by a preponderance of evidence and not left to conjecture or speculation").

Here, Dr. Jensen contends that he met his burden by presenting expert testimony establishing the rental value for a comparable substitute. Contrary to Dr. Jensen's suggestion, "proving loss of use damages is not as simple as merely offering evidence of what it would have cost . . . to rent a substitute." *Price v. City of Seattle*, No. C03-1365RSL, 2006 WL 2691402, at *5 (W.D. Wash. Sept. 19, 2006). Rather, absent a showing of actual damages, a plaintiff is not entitled to recover loss of use damages. *Wartell v. Hartford Ins. Co.*, 219 So.2d 221, 222-23 (La. App. 1st Cir. 1969); *Lopez v. Cosey*, 16-0812, p. 13 (La. App. 1 Cir. 2/17/17),

8

214 So.3d 18, 26 (reversing a loss of use damage award as "unsupported by the evidence").

Dr. Jensen suggests that the trial court erred in penalizing him by taking into account his mitigation of damages by reverting to use of the Student Cello. According to Dr. Jensen, it is irrelevant that he had the use of the Student Cello, that he lost no revenue, and that he did not rent a replacement cello.[8] Dr. Jensen contends that his decision to mitigate his damages by using the Student Cello, as opposed to renting one, has conferred a benefit upon him in allowing him to continue working and performing as a cellist and minimizing, to the extent possible, lost income, interruptions to his performance schedule, and expenses relating to losing work or securing an alternative cello. Dr. Jensen contends that, nonetheless, he is entitled to damages for loss of use of the cello based on the cost of renting a replacement for the time reasonably necessary to repair the cello, regardless of whether he actually rented a substitute or suffered any lost revenue.

Contrary to Dr. Jensen's contention, Louisiana jurisprudence imposes a duty on an injured tort victim to mitigate damages. *Aisole v. Dean,* 574 So.2d 1248, 1253 (La. 1991) (observing that "[o]ur jurisprudence has also recognized that an injured plaintiff has a duty to take reasonable steps to mitigate damages"). When the tort victim is able to fully mitigate any loss, the tort victim sustains no actual damages and, thus, may not recover loss of use damages. *See Rader v. Harper Aviation, Inc.*, 246 So.2d 362, 365 (La. App. 4th Cir. 1971);[9] *Interurban Transp.*

_____

[8] Before trial, Dr. Jensen filed a motion in limine to exclude evidence of the Student Cello. The trial court denied the motion.

[9] In *Rader,* this court found that loss of use damages could not be recovered for loss of use of an airplane. We reasoned that "[w]hile Rader [the plaintiff] could have rented a replacement plane to complete any pending contracts, by diligent efforts in locating parts and supervising repairs and by judicious scheduling, they eliminated the necessity of renting a replacement and thereby

9

*Co. v. F. Strauss & Sons*, 196 So. 367, 370 (La. App. 2d Cir. 1940);[10] *D & T*

*Sanitation, Inc. v. State Farm Mutual Automobile Ins. Co.*, 443 N.E.2d 1207, 1209

(Ind. App.1983).[11] Such is the case here.

Dr. Jensen prevented any compensable loss of use damage by reverting to

the use of the Student Cello. While it is admitted that Dr. Jensen was unable to use

the Granjon Cello during the period it was being repaired, he suffered no

substantial inconvenience because he owned a second cello, the Student Cello,

which he had used for thirty years before acquiring the one that was damaged. In

fact, Dr. Jensen had been in possession of the Granjon Cello for less than a year

before the rear-end collision occurred. Thus, Dr. Jensen failed to present any

evidence that he sustained any actual damages on which to calculate a loss of use

award.[12] Given Dr. Jensen's failure to prove actual damages, the trial court was not

manifestly erroneous in denying Dr. Jensen's special damages claim.

---

minimized damages. However commendable Rader's actions were, they cannot be awarded damages for losses which were not incurred." *Id.*

[10] In *Interurban Transp.*, a bus company claimed a loss of use for ten and a half days for one of its buses during the period it was being repaired. Denying the claim, the court reasoned that the bus company had no loss of use damages because a substitute bus in the company's fleet "picked up the slack" and transported the passengers the damaged bus would have otherwise carried had it not been damaged and in service. The bus company suffered no "loss of use damages" because it could not show it lost any profits from carriage of passengers earned by use of a substitute bus while the damaged bus was under repair. The appellate court observed that "[plaintiff] claims that it was a smaller bus, not nearly as nice or comfortable as the regular one, and the superintendent estimates that the business lost on this account was equivalent to the amount allowed by the lower court. It failed to show that any passengers who wished to ride the bus were prevented from doing so because the bus was not large enough or that anyone refused to ride in it because it was not as comfortable as the regular bus which was damaged. In fact, this item of damage is purely speculative and imaginary and there is no proof to sustain it." *Id.*

[11] In *D & T Sanitation*, a sanitation company's claim for loss of use damages was denied because the sanitation company was able to immediately replace its damaged truck-packer unit and neither lost customers nor profits as a result of the loss of use. The court rejected the sanitation company's argument that "denying recovery for the rental value in effect penalizes it for immediately securing a replacement vehicle." *Id.* Indeed, the court reasoned that "[t]o allow recovery beyond the injury actually suffered would provide a windfall." *Id.*

[12] Even assuming, *arguendo*, that Dr. Jensen had established he suffered actual damages, this would not be an appropriate case in which to use rental value to measure his loss of use claim.

*General Damages*

Dr. Jensen also contends the trial court abused its discretion in failing to award general damages for mental anguish and emotional upset. *See Alexander v. Qwik Change Car Ctr., Inc.*, 352 So.2d 188, 190 (La. 1977) (awarding damages for considerable inconvenience and mental anguish from the loss of use of a car). In his petition, Dr. Jensen requested an award of general damages for "fear and fright which [he] experienced for several months after the accident as he experienced frustration and doubt of being able to resume his life's career as a professional orchestra musician." Rejecting this claim, the trial court found that Dr. Jensen did not "suffer considerable inconvenience or mental anguish for the time his cello was being repaired."

---

The general rule that rental value is an appropriate method to calculate loss of use damages presupposes a functional rental market from which a market rental value can be estimated with a fair amount of certainty. *MCI, LLC v. Patriot Eng'g & Envtl., Inc.*, 487 F.Supp.2d 1029, 1036-37 (S.D. Ind. 2007). Most loss-of-use cases involve forms of transportation—cars, buses, or planes—that have a functional rental market. A vintage cello, however, does not.

Dr. Jensen and his expert, Ms. Smith, both testified to the lack of such a functioning market. According to Dr. Jensen, he would have to travel to New York to find a similar vintage instrument. Nonetheless, he proposes to use the hypothetical rental value suggested by Ms. Smith to value his loss of use claim at $65,000.00. Rejecting a similar attempt to use a hypothetical rental value, one court provided the following example:

> Suppose an expensive Italian sports car suffers minor damage requiring eight hours for repairs, and suppose there is no actual rental possible in the area on short notice for such a short term. Suppose the only way to rent the same model in a hurry is to have one shipped by air from the factory in Italy. The owner does not actually rent a substitute, but claims rental value as a measure for loss of use for eight hours. It would be unfair, even absurd, to measure the value of the loss of use by rental cost including the hypothetical air freight charges. It would not be reasonable to rent a substitute on those terms, meaning that there is no functioning rental market for a comparable substitute if those one-time fees are included in the terms.

*MCI*, 487 F.Supp.2d at 1039. Likewise, Dr. Jensen's proposal to use the hypothetical rental value of vintage instruments is not reasonable. Paraphrasing, the problem with Dr. Jensen's damages theory is that there "simply is no evidence of a market for comparable [vintage cellos]." *Id*. at 1037.

11

On appeal, Dr. Jensen contends that his general damage claim is for the anxiety and worry that there might be something profoundly wrong with the cello as a result of the accident and that his concern was magnified by the fear that he would still be responsible for paying the balance due on the Granjon Cello even if it were irreparably damaged. Dr. Jensen contends that the trial court abused its discretion in failing to award general damages for his mental anguish and emotional upset. We disagree.

In Louisiana, an award for mental anguish resulting from property damage is permissible only in limited situations.[13] The mental anguish, however, must be a real mental injury; "[t]he usual worry over the consequences of property damage (where a plaintiff suffers no direct mental injury from the negligent act) will not justify an award for mental anguish damages." *Elston v. Valley Elec. Membership Corp.*, 381 So.2d 554, 556 (La. App. 2d Cir. 1980). Such is the case here. *Accord Heard v. Affordable Movers, Inc.*, 40,432, p. 8 (La. App. 2 Cir. 12/14/05), 917 So.2d 722, 727 (observing that it was "undisputed that plaintiff suffered distress as a result of the destruction of his family heirlooms" but finding he suffered no "real mental injury" or "psychic trauma in the nature of or similar to a physical injury"). The trial court did not abuse its discretion in failing to award general damages.

## DECREE

For the foregoing reasons, the trial court's judgment is affirmed.

**AFFIRMED**

---

[13] The jurisprudence recognizes the right to recover mental anguish resulting from property damages only in four circumstances: (1) when property is damaged by an intentional or illegal act; (2) when property is damaged by acts for which the tortfeasor will be strictly or absolutely liable; (3) when property is damaged by acts constituting a continuing nuisance; or (4) when property is damaged when the owner is either present or nearby and suffered a psychic trauma as a direct result. *Holzenthal v. Sewerage & Water Bd. of New Orleans*, 06-0796, 06-0797, 06-0798, p. 39 (La. App. 4 Cir. 1/10/07), 950 So.2d 55, 79. This case is arguably an example of the fourth circumstance.